# PREISER, CORRECTION COMMISSIONER, ET AL. *v.* RODRIGUEZ ET AL.

No. 71–1369.   Argued January 9, 1973—Decided May 7, 1973

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post*, p. 500.

*Lillian Z. Cohen*, Assistant Attorney General of New York, argued the cause for petitioners. With her on the brief were *Louis J. Lefkowitz*, Attorney General, and *Samuel A. Hirshowitz*, First Assistant Attorney General.

*Herman Schwartz* argued the cause for respondents. With him on the brief were *Jack Greenberg, Stanley A. Bass*, and *Melvin L. Wulf*.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The respondents in this case were state prisoners who were deprived of good-conduct-time credits by the New York State Department of Correctional Services as a result of disciplinary proceedings. They then brought actions in a federal district court, pursuant to the Civil Rights Act of 1871, 42 U. S. C. § 1983. Alleging that the Department had acted unconstitutionally in depriving them of the credits, they sought injunctive relief to compel restoration of the credits, which in each case would result in their immediate release from confinement in

---

*\*Evelle J. Younger*, Attorney General, *Edward A. Hinz, Jr.*, Chief Assistant Attorney General, *Doris H. Maier* and *Arlo E. Smith*, Assistant Attorneys General, and *Derald E. Granberg*, Deputy Attorney General, filed a brief for the State of California as *amicus curiae* urging reversal.

*Robert Meserve, Robert Kutak, William Falsgraf, Daniel Skoler*, and *Richard Singer* filed a brief for the American Bar Assn. as *amicus curiae* urging affirmance.

prison. The question before us is whether state prisoners seeking such redress may obtain equitable relief under the Civil Rights Act, even though the federal habeas corpus statute, 28 U. S. C. § 2254, clearly provides a specific federal remedy.

The question is of considerable practical importance. For if a remedy under the Civil Rights Act is available, a plaintiff need not first seek redress in a state forum. *Monroe* v. *Pape,* 365 U. S. 167, 183 (1961); *McNeese* v. *Board of Education,* 373 U. S. 668, 671 (1963); *Damico* v. *California,* 389 U. S. 416 (1967); *King* v. *Smith,* 392 U. S. 309, 312 n. 4 (1968); *Houghton* v. *Shafer,* 392 U. S. 639 (1968). If, on the other hand, habeas corpus is the exclusive federal remedy in these circumstances, then a plaintiff cannot seek the intervention of a federal court until he has first sought and been denied relief in the state courts, if a state remedy is available and adequate. 28 U. S. C. § 2254 (b).

The present consolidated case originated in three separate actions, brought individually by the three respondents. The respondent Rodriguez, having been convicted in a New York state court of perjury and attempted larceny, was sentenced to imprisonment for an indeterminate term of from one and one-half to four years. Under New York Correction Law § 803 and Penal Law §§ 70.30 (4)(a), 70.40 (1)(b), a prisoner serving an indeterminate sentence may elect to participate in a conditional-release program by which he may earn up to 10 days per month good-behavior-time credit toward reduction of the maximum term of his sentence. Rodriguez elected to participate in this program. Optimally, such a prisoner may be released on parole after having served approximately two-thirds of his maximum sentence (20 days out of every 30); but accrued good-behavior credits so earned may at any time be withdrawn, in whole

or in part, for bad behavior or for violation of the institutional rules. N. Y. Correction Law § 803 (1).

Rodriguez was charged in two separate disciplinary action reports with possession of contraband material in his cell. The deputy warden determined that as punishment, 120 days of Rodriguez' earned good-conduct-time credits should be canceled, and that Rodriguez should be placed in segregation, where he remained for more than 40 days. In the "Remarks" section of the deputy warden's determination was a statement that Rodriguez had refused to disclose how he had managed to obtain possession of the items in question.

Rodriguez then filed in the District Court a complaint pursuant to § 1983, combined with a petition for a writ of habeas corpus. He asserted that he was not really being punished for possession of the contraband material, but for refusal to disclose how he had obtained it, and that he had received no notice or hearing on the charges for which he had ostensibly been punished. Thus, he contended that he had been deprived of his good-conduct-time credits without due process of law.

After a hearing, the District Court held that Rodriguez' suit had properly been brought under the Civil Rights Act, that the habeas corpus claim was "merely a proper adjunct to insure full relief if [Rodriguez] prevails in the dominant civil rights claim," 307 F. Supp. 627, 628–629 (1969), and that therefore Rodriguez was not required to exhaust his state remedies, as he would have had to do if he had simply filed a petition for habeas corpus. On the merits, the District Court agreed with Rodriguez that the questioning of him by prison officials related solely to the issue of how he had obtained the contraband materials, and that he had been ostensibly punished for something different—possession of the materials—on which he had had no notice or opportunity to answer. This, the court found, denied him due process

of law, particularly in light of the fact that the prison regulations prescribed no penalty for failure to inform. The District Court further found that the Prison Commutation Board had failed to forward to the Commissioner of Correction written reasons for the cancellation of Rodriguez' good-conduct time, as required by former N. Y. Correction Law § 236, and that this, too, had deprived Rodriguez of due process and equal protection of the laws. Accordingly, the court declared the cancellation of 120 days' good-behavior-time credits unconstitutional, and directed the Commissioner of Correction to restore those credits to Rodriguez. Since, at that time, Rodriguez' conditional-release date had already passed, the District Court's order entitled him to immediate release from prison on parole.

The Court of Appeals reversed this decision by a divided vote. The appellate court not only disagreed with the District Court on the merits, but also held that Rodriguez' action was really a petition for habeas corpus and, as such, should not have been entertained by the District Court because Rodriguez had not exhausted his state remedies in accordance with § 2254 (b). As the Court of Appeals put it:

> "The present application, since it seeks release from custody, is in fact an application for habeas corpus. '[R]elease from penal custody is not an available remedy under the Civil Rights Act.' Peinado v. Adult Authority of Dept. of Corrections, 405 F. 2d 1185, 1186 (9th Cir.), cert. denied, 395 U. S. 968 (1969). In Johnson v. Walker, 317 F. 2d 418, 419–420 (5th Cir. 1963) the court said: 'Use of the Civil Rights Statutes to secure release of persons imprisoned by State Courts would thus have the effect of repealing 28 U. S. C. § 2254; of course, such was not the intent of Congress.'" Rodriguez v. McGinnis, 451 F. 2d 730, 731 (1971).

The judgment of the Court of Appeals was subsequently set aside, and the case was reheard *en banc*, as explained below.

The respondent Katzoff, who was serving a sentence of one to three years in prison following his conviction for possession of a dangerous weapon, also elected to participate in New York's conditional-release program. Disciplinary charges were brought against him for making derogatory comments about prison officials in his diary. As punishment, the deputy warden deprived him of 30 days' good-conduct time for these diary entries and confined him in segregation for 57 days. Katzoff ultimately lost 50 days' good-behavior-time credits—30 days directly and 20 additional days because he was unable to earn any good-conduct time while in segregation. He brought a civil rights complaint under § 1983, joined with a petition for habeas corpus, in Federal District Court, alleging that the prison officials had acted unconstitutionally.

The District Court held, in an unreported opinion, that Katzoff's failure to exhaust state remedies was no bar to his suit, since it was a civil rights action and the petition for a writ of habeas corpus was only an incidental adjunct to assure enforcement of the judgment. On the merits, the District Court found that there was no prison regulation against the keeping of a diary; that punishment for entries in a private diary violated Katzoff's constitutional rights to due process, equal protection, and freedom of thought; and that confining Katzoff in segregation for this offense constituted cruel and unusual punishment. The court, therefore, ordered that the 50 days' good-behavior-time credits be restored to Katzoff, and since this restoration entitled him to immediate release on parole, the court ordered such release.

The Court of Appeals reversed by a divided vote. Without reaching the merits of Katzoff's complaint, the appellate court held that his action was in essence an

application for habeas corpus since it sought and obtained his immediate release from custody, and that therefore his complaint should have been dismissed because Katzoff had sought no relief whatever in the state courts and had made no showing that an adequate state remedy was unavailable. *United States ex rel. Katzoff* v. *McGinnis,* 441 F. 2d 558 (1971). This judgment of the Court of Appeals was subsequently set aside, and the case was reheard *en banc,* as explained below.

The respondent Kritsky's case is similar. While serving a prison sentence of 15 to 18 years under a state court conviction for armed robbery, he was charged by prison officials with being a leader in a prison-wide protest demonstration and with advocating insurrection during that demonstration. When brought before the warden and asked how he would plead, Kritsky stated "Not guilty." The warden then immediately and summarily imposed punishment on him—deprivation of 545 days' good-conduct-time credits, and confinement in segregation for four and one-half months, where he lost another 45 days' good time.

Kritsky subsequently filed a civil rights action, combined with a petition for habeas corpus, in Federal District Court, alleging that his summary punishment had deprived him of his good-time credits without due process of law. The District Court found Kritsky's complaint to be a proper civil rights action, and went on to rule that he had been denied due process by the imposition of summary punishment and by the failure of the Prison Commutation Board to file with the Commissioner written reasons for cancellation of Kritsky's good-time credits, as required by New York law. 313 F. Supp. 1247 (1970). Accordingly, the court ordered restoration of the 590 days' good-conduct-time credits, which entitled Kritsky to immediate release on parole.

An appeal was argued before a panel of the Court of Appeals; but, before decision, that Court ordered the case to be reheard *en banc,* together with the *Rodriguez* and *Katzoff* cases. After rehearing *en banc* of the three now-consolidated cases, the Court of Appeals, with three dissents, affirmed the judgments of the District Court in all of the cases "upon consideration of the merits and upon the authority of Wilwording v. Swenson, [404 U. S. 249] decided by the Supreme Court of the United States on December 14, 1971." *Rodriguez* v. *McGinnis,* 456 F. 2d 79, 80 (1972). Although eight judges wrote separate opinions, it is clear that the majority of the Court relied primarily on our opinion in the *Wilwording* case, holding that complaints of state prisoners relating to the conditions of their confinement were cognizable either in federal habeas corpus or under the Civil Rights Act, and that as civil rights actions they were not subject to any requirement of exhaustion of state remedies.

We granted certiorari *sub nom. Oswald* v. *Rodriguez,* 407 U. S. 919, in order to consider the bearing of the *Wilwording* decision upon the situation before us—where state prisoners have challenged the actual duration of their confinement on the ground that they have been unconstitutionally deprived of good-conduct-time credits, and where restoration of those credits would result in their immediate release from prison or in shortening the length of their confinement. In that context, the question whether a state prisoner may bring an action for equitable relief pursuant to § 1983, or whether he is limited to the specific remedy of habeas corpus, presents an unresolved and important problem in the administration of federal justice.

The problem involves the interrelationship of two important federal laws. The relevant habeas corpus statutes are 28 U. S. C. §§ 2241 and 2254. Section 2241 (c)

provides that "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . (3) [h]e is in custody in violation of the Constitution or laws or treaties of the United States . . . ."   Section 2254 provides in pertinent part:

"(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

"(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." [1]

The Civil Rights Act, 42 U. S. C. § 1983, provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

---

[1] See also 28 U. S. C. § 2243, quoted in n. 12, *infra*.

party injured in an action at law, suit in equity, or other proper proceeding for redress."

It is clear, not only from the language of §§ 2241 (c)(3) and 2254 (a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody. By the end of the 16th century, there were in England several forms of habeas corpus, of which the most important and the only one with which we are here concerned was *habeas corpus ad subjiciendum*—the writ used to "inquir[e] into illegal detention with a view to an order releasing the petitioner." *Fay* v. *Noia,* 372 U. S. 391, 399 n. 5 (1963).[2] Whether the petitioner had been placed in physical confinement by executive direction alone,[3] or by order of a court,[4] or even by private parties,[5] habeas corpus was the proper means of challenging that confinement and seeking release. Indeed, in 1670, the Chief Justice of the Common Pleas was able to say, in ordering the immediate

---

[2] Other forms of habeas corpus include *habeas corpus ad respondendum; ad satisfaciendum; ad prosequendum, testificandum, deliberandum;* and *ad faciendum et recipiendum.* See *Fay* v. *Noia,* 372 U. S. 391, 399 n. 5 (1963). But when the words "habeas corpus" are used alone, they have been considered a generic term understood to refer to the common-law writ of *habeas corpus ad subjiciendum,* which was the form termed the "great writ." *Ex parte Bollman,* 4 Cranch 75, 95 (1807).

[3] See, *e. g., Darnel's Case,* 3 How. St. Tr. 1–59 (K. B. 1627); Petition of Right, 3 Car. 1, c. 1 (1627); Habeas Corpus Act, 16 Car. 1, c. 10, §§ 3, 8 (1640). See also *Ex parte Wells,* 18 How. 307 (1856); *Ex parte Milligan,* 4 Wall. 2 (1866); *Parisi* v. *Davidson,* 405 U. S. 34 (1972).

[4] See, *e. g., Bushell's Case,* Vaughan 135, 124 Eng. Rep. 1006 (1670); *Fay* v. *Noia, supra.*

[5] See, *e. g., Rex* v. *Clarkson,* 1 Strange 444, 93 Eng. Rep. 625 (K. B. 1721); *Ford* v. *Ford,* 371 U. S. 187 (1962).

discharge of a juror who had been jailed by a trial judge for bringing in a verdict of not guilty, that "[t]he writ of habeas corpus is now the most usual remedy by which a man is restored again to his liberty, if he have been against law deprived of it." *Bushell's Case,* Vaughan 135, 136, 124 Eng. Rep. 1006, 1007.

By the time the American Colonies achieved independence, the use of habeas corpus to secure release from unlawful physical confinement, whether judicially imposed or not, was thus an integral part of our common-law heritage. The writ was given explicit recognition in the Suspension Clause of the Constitution, Art. I, § 9, cl. 2; [6] was incorporated in the first congressional grant of jurisdiction to the federal courts, Act of Sept. 24, 1789, c. 20, § 14, 1 Stat. 81–82; and was early recognized by this Court as a "great constitutional privilege." *Ex parte Bollman,* 4 Cranch 75, 95 (1807). See *Fay* v. *Noia, supra,* at 399–415.

The original view of a habeas corpus attack upon detention under a judicial order was a limited one. The relevant inquiry was confined to determining simply whether or not the committing court had been possessed of jurisdiction. *E. g., Ex parte Kearney,* 7 Wheat. 38 (1822); *Ex parte Watkins,* 3 Pet. 193 (1830). But, over the years, the writ of habeas corpus evolved as a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental law, even though imposed pursuant to conviction by a court of competent jurisdiction. See *Ex parte Lange,* 18 Wall. 163 (1874); *Ex parte Siebold,* 100 U. S. 371 (1880); *Ex parte Wilson,* 114 U. S. 417 (1885); *Moore* v. *Dempsey,* 261 U. S. 86 (1923); *Johnson* v. *Zerbst,* 304 U. S.

---

[6] "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

458 (1938); and *Waley* v. *Johnston,* 316 U. S. 101 (1942). See also *Fay* v. *Noia, supra,* at 405–409, and cases cited at 409 n. 17. Thus, whether the petitioner's challenge to his custody is that the statute under which he stands convicted is unconstitutional, as in *Ex parte Siebold, supra;* that he has been imprisoned prior to trial on account of a defective indictment against him, as in *Ex parte Royall,* 117 U. S. 241 (1886); that he is unlawfully confined in the wrong institution, as in *In re Bonner,* 151 U. S. 242 (1894), and *Humphrey* v. *Cady,* 405 U. S. 504 (1972); that he was denied his constitutional rights at trial, as in *Johnson* v. *Zerbst, supra;* that his guilty plea was invalid, as in *Von Moltke* v. *Gillies,* 332 U. S. 708 (1948); that he is being unlawfully detained by the Executive or the military, as in *Parisi* v. *Davidson,* 405 U. S. 34 (1972); or that his parole was unlawfully revoked, causing him to be reincarcerated in prison, as in *Morrissey* v. *Brewer,* 408 U. S. 471 (1972)—in each case his grievance is that he is being unlawfully subjected to physical restraint, and in each case habeas corpus has been accepted as the specific instrument to obtain release from such confinement.[7]

---

[7] It was not until quite recently that habeas corpus was made available to challenge less obvious restraints. In 1963, the Court held that a prisoner released on parole from immediate physical confinement was nonetheless sufficiently restrained in his freedom as to be in custody for purposes of federal habeas corpus. *Jones* v. *Cunningham,* 371 U. S. 236. In *Carafas* v. *LaVallee,* 391 U. S. 234 (1968), the Court for the first time decided that once habeas corpus jurisdiction has attached, it is not defeated by the subsequent release of the prisoner. And just this Term, in *Hensley* v. *Municipal Court, ante,* p. 345, we held that a person, who, after conviction, is released on bail or on his own recognizance, is "in custody" within the meaning of the federal habeas corpus statute. But those cases marked no more than a logical extension of the traditional meaning and purpose of habeas corpus—to effect release from illegal custody.

In the case before us, the respondents' suits in the District Court fell squarely within this traditional scope of habeas corpus. They alleged that the deprivation of their good-conduct-time credits was causing or would cause them to be in illegal physical confinement, i. e., that once their conditional-release date had passed, any further detention of them in prison was unlawful; and they sought restoration of those good-time credits, which, by the time the District Court ruled on their petitions, meant their immediate release from physical custody.

Even if the restoration of the respondents' credits would not have resulted in their immediate release, but only in shortening the length of their actual confinement in prison, habeas corpus would have been their appropriate remedy. For recent cases have established that habeas corpus relief is not limited to immediate release from illegal custody, but that the writ is available as well to attack future confinement and obtain future releases. In *Peyton* v. *Rowe,* 391 U. S. 54 (1968), the Court held that a prisoner may attack on habeas the second of two consecutive sentences while still serving the first. The Court pointed out that the federal habeas corpus statute "does not deny the federal courts power to fashion appropriate relief other than immediate release. Since 1874, the habeas corpus statute has directed the courts to determine the facts and dispose of the case summarily, 'as law and justice require.' Rev. Stat. § 761 (1874), superseded by 28 U. S. C. § 2243." *Id.,* at 66–67. See also *Walker* v. *Wainwright,* 390 U. S. 335 (1968); *Carafas* v. *LaVallee,* 391 U. S. 234, 239 (1968); *Braden* v. *30th Judicial Circuit Court of Kentucky,* 410 U. S. 484 (1973). So, even if restoration of respondents' good-time credits had merely shortened the length of their confinement, rather than required immediate discharge from that confinement, their suits would still have been within the core of habeas corpus in attacking the very duration of their physical

confinement itself. It is beyond doubt, then, that the respondents could have sought and obtained fully effective relief through federal habeas corpus proceedings.[8]

Although conceding that they could have proceeded by way of habeas corpus, the respondents argue that the Court of Appeals was correct in holding that they were nonetheless entitled to bring their suits under § 1983 so as to avoid the necessity of first seeking relief in a state forum. Pointing to the broad language of § 1983,[9] they argue that since their complaints plainly came within the literal terms of that statute, there is no justifiable reason to exclude them from the broad remedial protection provided by that law. According to the respondents, state prisoners seeking relief under the Civil Rights Act

---

[8] Our Brothers in dissent state that the respondents' claims "could not, in all likelihood, have been heard on habeas corpus at the time the present habeas corpus statute was enacted in 1867, or at the time the exhaustion doctrine was first announced in *Ex parte Royall,* 117 U. S. 241 (1886), or at the time the requirement was codified in 1948 . . . ." *Post,* at 512–513. (Footnotes omitted.) This statement is apparently based on the assumption that, in those years, the respondents' habeas actions would have been barred by the "prematurity" doctrine, which precluded habeas relief that would have merely reduced the length of the prisoner's confinement rather than resulting in his immediate release, and which was not rejected until 1968, *Peyton* v. *Rowe,* 391 U. S. 54. We note, however, that the respondent Katzoff initiated his action more than a month after his alleged release date, and thus his claim, if accepted, entitled him to immediate release even as of the date on which he brought suit. Although Rodriguez initiated his action 15 days before his alleged release date, and Kritsky six months before such date, in both cases those dates had long passed at the time of the District Court's decisions, and these respondents were thus entitled to immediate release at that time. In any event, the nature of the respondents' suits was an attack on the legality of their physical confinement itself; and to deal with such attacks on physical custody, however imposed and whether or not related to conviction by a court, is the long-established function of habeas corpus. See *supra,* at 484–486.

[9] See *supra,* at 483–484.

should be treated no differently from any other civil rights plaintiffs, when the language of the Act clearly covers their causes of action.

The broad language of § 1983, however, is not conclusive of the issue before us. The statute is a general one, and, despite the literal applicability of its terms, the question remains whether the specific federal habeas corpus statute, explicitly and historically designed to provide the means for a state prisoner to attack the validity of his confinement, must be understood to be the exclusive remedy available in a situation like this where it so clearly applies. The respondents' counsel acknowledged at oral argument that a state prisoner challenging his underlying conviction and sentence on federal constitutional grounds in a federal court is limited to habeas corpus. It was conceded that he cannot bring a § 1983 action, even though the literal terms of § 1983 might seem to cover such a challenge, because Congress has passed a more specific act to cover that situation, and, in doing so, has provided that a state prisoner challenging his conviction must first seek relief in a state forum, if a state remedy is available. It is clear to us that the result must be the same in the case of a state prisoner's challenge to the fact or duration of his confinement, based, as here, upon the alleged unconstitutionality of state administrative action. Such a challenge is just as close to the core of habeas corpus as an attack on the prisoner's conviction, for it goes directly to the constitutionality of his physical confinement itself and seeks either immediate release from that confinement or the shortening of its duration.

In amending the habeas corpus laws in 1948, Congress clearly required exhaustion of adequate state remedies as a condition precedent to the invocation of federal judicial relief under those laws. It would wholly frustrate explicit congressional intent to hold that the respondents in the present case could evade this requirement by the

simple expedient of putting a different label on their pleadings. In short, Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983.

The policy reasons underlying the habeas corpus statute support this conclusion. The respondents concede that the reason why only habeas corpus can be used to challenge a state prisoner's underlying conviction is the strong policy requiring exhaustion of state remedies in that situation—to avoid the unnecessary friction between the federal and state court systems that would result if a lower federal court upset a state court conviction without first giving the state court system an opportunity to correct its own constitutional errors. *Fay* v. *Noia, supra,* at 419–420. But they argue that this concern applies only to federal interference with state court convictions; and to support this argument, they quote from *Ex parte Royall, supra,* the case that first mandated exhaustion of state remedies as a precondition to federal habeas corpus:

> "The injunction to hear the case summarily, and thereupon 'to dispose of the party as law and justice require' does not deprive the court of discretion as to the time and mode in which it will exert the powers conferred upon it. That discretion should be exercised in the light of the relations existing, under our system of government, *between the judicial tribunals of the Union and of the States,* and in recognition of the fact that the public good requires that those relations be not disturbed by *unnecessary conflict between courts* equally bound to guard and protect rights secured by the Constitution." 117 U. S., at 251 (emphasis added).

In the respondents' view, the whole purpose of the exhaustion requirement, now codified in § 2254 (b), is to

give state *courts* the first chance at remedying *their own* mistakes, and thereby to avoid "the unseemly spectacle of federal district courts trying the regularity of proceedings had in *courts* of coordinate jurisdiction." Parker, Limiting the Abuse of Habeas Corpus, 8 F. R. D. 171, 172–173 (1948) (emphasis added). This policy, the respondents contend, does not apply when the challenge is not to the action of a state court, but, as here, to the action of a state administrative body. In that situation, they say, the concern with avoiding unnecessary interference by one court with the courts of another sovereignty with concurrent powers, and the importance of giving state courts the first opportunity to correct constitutional errors made by them, do not apply; and hence the purpose of the exhaustion requirement of the habeas corpus statute is inapplicable.

We cannot agree. The respondents, we think, view the reasons for the exhaustion requirement of § 2254 (b) far too narrowly. The rule of exhaustion in federal habeas corpus actions is rooted in considerations of federal-state comity. That principle was defined in *Younger* v. *Harris,* 401 U. S. 37, 44 (1971), as "a proper respect for state functions," and it has as much relevance in areas of particular state administrative concern as it does where state judicial action is being attacked. That comity considerations are not limited to challenges to the validity of state court convictions is evidenced by cases such as *Morrissey* v. *Brewer, supra,* where the petitioners' habeas challenge was to a state administrative decision to revoke their parole, and *Braden* v. *30th Judicial Circuit Court of Kentucky, supra,* where the petitioner's habeas attack was on the failure of state prosecutorial authorities to afford him a speedy trial.

It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures,

than the administration of its prisons. The relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen. For state prisoners, eating, sleeping, dressing, washing, working, and playing are all done under the watchful eye of the State, and so the possibilities for litigation under the Fourteenth Amendment are boundless. What for a private citizen would be a dispute with his landlord, with his employer, with his tailor, with his neighbor, or with his banker becomes, for the prisoner, a dispute with the State. Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems. Moreover, because most potential litigation involving state prisoners arises on a day-to-day basis, it is most efficiently and properly handled by the state administrative bodies and state courts, which are, for the most part, familiar with the grievances of state prisoners and in a better physical and practical position to deal with those grievances. In New York, for example, state judges sit on a regular basis at all but one of the State's correctional facilities, and thus inmates may present their grievances to a court at the place of their confinement, where the relevant records are available and where potential witnesses are located. The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.[10]

---

[10] The dissent argues that the respondents' attacks on the actions of the prison administration here are no different, in terms of the potential for exacerbating federal-state relations, from the attacks made by the petitioners in *McNeese* v. *Board of Education*, 373

Requiring exhaustion in situations like that before us means, of course, that a prisoner's state remedy must be adequate and available, as indeed § 2254 (b) provides. The respondents in this case concede that New York provided them with an adequate remedy for the restoration of their good-time credits, through § 79–c of the New York Civil Rights Law, which explicitly provides for injunctive relief to a state prisoner "for improper treatment where such treatment constitutes a violation of his constitutional rights." (Supp. 1972–1973.)

But while conceding the availability in the New York courts of an opportunity for equitable relief, the respondents contend that confining state prisoners to federal habeas corpus, after first exhausting state remedies, could deprive those prisoners of any damages remedy to which they might be entitled for their mistreatment, since damages are not available in federal habeas corpus proceedings, and New York provides no damages remedy at all for state prisoners. In the respondents' view, if habeas corpus is the exclusive federal remedy for a state prisoner attacking his confinement, damages might never be obtained, at least where the State makes no provision for them. They argue that even if such a prisoner were to bring a subsequent federal civil rights action for damages, that action could be barred by principles of

U. S. 668 (1963), *Damico* v. *California*, 389 U. S. 416 (1967), and *Monroe* v. *Pape*, 365 U. S. 167 (1961), on the various state administrative actions there. Thus, it is said, since exhaustion of state remedies was not required in those cases, it is anomalous to require it here. *Post*, at 522. The answer, of course, is that in those cases, brought pursuant to § 1983, no other, more specific federal statute was involved that might have reflected a different congressional intent. In the present case, however, the respondents' actions fell squarely within the traditional purpose of federal habeas corpus, and Congress has made the specific determination in § 2254 (b) that requiring the exhaustion of adequate state remedies in such cases will best serve the policies of federalism.

*res judicata* where the state courts had previously made an adverse determination of his underlying claim, even though a federal habeas court had later granted him relief on habeas corpus.

The answer to this contention is that the respondents here sought no damages, but only equitable relief—restoration of their good-time credits—and our holding today is limited to that situation. If a state prisoner is seeking damages, he is attacking something other than the fact or length of his confinement, and he is seeking something other than immediate or more speedy release—the traditional purpose of habeas corpus. In the case of a damages claim, habeas corpus is *not* an appropriate or available federal remedy. Accordingly, as petitioners themselves concede, a damages action by a state prisoner could be brought under the Civil Rights Act in federal court without any requirement of prior exhaustion of state remedies. Cf. *Ray* v. *Fritz,* 468 F. 2d 586 (CA2 1972).

The respondents next argue that to require exhaustion of state remedies in a case such as the one at bar would deprive a state prisoner of the speedy review of his grievance which is so often essential to any effective redress. They contend that if, prior to bringing an application for federal habeas corpus, a prisoner must exhaust state administrative remedies and then state judicial remedies through all available appeals, a very significant period of time might elapse before the prisoner could ever get into federal court. By that time, no matter how swift and efficient federal habeas corpus relief might be, the prisoner might well have suffered irreparable injury and his grievances might no longer be remediable.

It is true that exhaustion of state remedies takes time. But there is no reason to assume that state prison ad-

ministrators or state courts will not act expeditiously. Indeed, new regulations established by the New York Department of Correctional Services provide for administrative review of a prisoner's record in the institution shortly before the *earliest* possible release date, 7 N. Y. Codes, Rules & Regulations § 261.3 (b),[11] and, as previously noted, state judges in New York actually sit in the institutions to hear prisoner complaints. Moreover, once a state prisoner arrives in federal court with his petition for habeas corpus, the federal habeas statute provides for a swift, flexible, and summary determination of his claim. 28 U. S. C. § 2243.[12] See also *Harris* v. *Nelson,* 394 U. S. 286 (1969); and *Hens-*

---

[11] That section provides that each inmate's file "shall be considered not more than three nor less than two months before the earliest possible date he would be entitled to consideration for parole or conditional or other release if that date depends upon the amount of good behavior allowance to be granted (based upon the assumption that he has earned all good behavior allowances that can be granted)."

[12] That section provides

"A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

"The writ, or order to show cause shall be directed to the person having custody of the person detained. It shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed.

"The person to whom the writ or order is directed shall make a return certifying the true cause of the detention.

"When the writ or order is returned a day shall be set for hearing, not more than five days after the return unless for good cause additional time is allowed.

"Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.

"The applicant or the person detained may, under oath, deny

*ley* v. *Municipal Court, ante,* at 349–350. By contrast, the filing of a complaint pursuant to § 1983 in federal court initiates an original plenary civil action, governed by the full panoply of the Federal Rules of Civil Procedure. That such a proceeding, with its discovery rules and other procedural formalities, can take a significant amount of time, very frequently longer than a federal habeas corpus proceeding, is demonstrated by the respondents' actions in the present case. Although both Rodriguez and Kritsky initiated their actions before their conditional-release dates, the District Court did not reach its decisions until three and 10 months later, respectively—in both cases well after the conditional-release dates had passed. Only in Katzoff's case was there a speedy determination, and his action was not initiated until after his alleged release date.

In any event, the respondents' time argument would logically extend to a state prisoner who challenges the constitutionality of a conviction that carried a relatively

---

any of the facts set forth in the return or allege any other material facts.

"The return and all suggestions made against it may be amended, by leave of court, before or after being filed.

"The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."

See also 28 U. S. C. § 2254 (e):

"If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination."

short sentence; and yet such a prisoner is clearly covered by § 2254 (b). Arguably, in either case, if the prisoner could make out a showing that, because of the time factor, his otherwise adequate state remedy would be inadequate, a federal court might entertain his habeas corpus application immediately, under § 2254 (b)'s language relating to "the existence of circumstances rendering such [state] process ineffective to protect the rights of the prisoner." But we need not reach that issue here.

Principles of *res judicata* are, of course, not wholly applicable to habeas corpus proceedings. 28 U. S. C. § 2254 (d). See *Salinger* v. *Loisel*, 265 U. S. 224, 230 (1924). Hence, a state prisoner in the respondents' situation who has been denied relief in the state courts is not precluded from seeking habeas relief on the same claims in federal court. On the other hand, *res judicata* has been held to be fully applicable to a civil rights action brought under § 1983. *Coogan* v. *Cincinnati Bar Assn.*, 431 F. 2d 1209, 1211 (CA6 1970); *Jenson* v. *Olson*, 353 F. 2d 825 (CA8 1965); *Rhodes* v. *Meyer*, 334 F. 2d 709, 716 (CA8 1964); *Goss* v. *Illinois*, 312 F. 2d 257 (CA7 1963). Accordingly, there would be an inevitable incentive for a state prisoner to proceed at once in federal court by way of a civil rights action, lest he lose his right to do so. This would have the unfortunate dual effect of denying the state prison administration and the state courts the opportunity to correct the errors committed in the State's own prisons, and of isolating those bodies from an understanding of and hospitality to the federal claims of state prisoners in situations such as those before us.[13] Federal habeas corpus, on the other

---

[13] This isolation, of course, will not occur if the prisoner is required to proceed by way of federal habeas corpus, with its exhaustion requirement. For "exhaustion preserves the role of the state courts in the application and enforcement of federal law: Early federal intervention in state . . . proceedings would tend to remove

hand, serves the important function of allowing the State to deal with these peculiarly local problems on its own, while preserving for the state prisoner an expeditious federal forum for the vindication of his federally protected rights, if the State has denied redress.

The respondents place a great deal of reliance on our recent decisions upholding the right of state prisoners to bring federal civil rights actions to challenge the conditions of their confinement. *Cooper* v. *Pate,* 378 U. S. 546 (1964); *Houghton* v. *Shafer,* 392 U. S. 639 (1968); *Wilwording* v. *Swenson,* 404 U. S. 249 (1971); *Haines* v. *Kerner,* 404 U. S. 519 (1972). But none of the state prisoners in those cases was challenging the fact or duration of his physical confinement itself, and none was seeking immediate release or a speedier release from that confinement—the heart of habeas corpus. In *Cooper,* the prisoner alleged that, solely because of his religious beliefs, he had been denied permission to purchase certain religious publications and had been denied other privileges enjoyed by his fellow prisoners. In *Houghton,* the prisoner's contention was that prison authorities had violated the Constitution by confiscating legal materials which he had acquired for pursuing his appeal, but which, in violation of prison rules, had been found in the possession of another prisoner. In *Wilwording,* the prisoners' complaints related solely to their living conditions and disciplinary measures while confined in maximum security. And in *Haines,* the prisoner claimed that prison officials had acted unconstitutionally by placing him in solitary confinement as a disciplinary measure, and he sought damages for claimed physical injuries sustained while so segregated. It is clear, then, that in

federal questions from the state courts, isolate those courts from constitutional issues, and thereby remove their understanding of and hospitality to federally protected interests." Note, Developments in the Law—Habeas Corpus, 83 Harv. L. Rev. 1038, 1094 (1970).

all those cases, the prisoners' claims related solely to the States' alleged unconstitutional treatment of them while in confinement. None sought, as did the respondents here, to challenge the very fact or duration of the confinement itself. Those cases, therefore, merely establish that a § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody. Upon that understanding, we reaffirm those holdings. Cf. *Humphrey* v. *Cady*, 405 U. S., at 516–517, n. 18.[14]

This is not to say that habeas corpus may not also be available to challenge such prison conditions. See *Johnson* v. *Avery*, 393 U. S. 483 (1969); *Wilwording* v. *Swenson, supra,* at 251. When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal. See Note, Developments in the Law—Habeas Corpus, 83 Harv. L. Rev. 1038, 1084 (1970).[15]

---

[14] If a prisoner seeks to attack both the conditions of his confinement and the fact or length of that confinement, his latter claim, under our decision today, is cognizable only in federal habeas corpus, with its attendant requirement of exhaustion of state remedies. But, consistent with our prior decisions, that holding in no way precludes him from simultaneously litigating in federal court, under § 1983, his claim relating to the conditions of his confinement.

[15] The parties disagree as to the original reason for the emergence of concurrent federal remedies in prison condition cases. According to the petitioners, the parallel development reflects the fact that prior to the Court's decisions in *Jones* v. *Cunningham,* 371 U. S. 236 (1963), *Carafas* v. *LaVallee,* 391 U. S. 234 (1968), and *Johnson* v. *Avery,* 393 U. S. 483 (1969), the limits of the concept of custody for purposes of habeas corpus were uncertain, and so the clearest remedy for prisoners challenging their conditions was through a civil rights action. The respondents take the converse position—that habeas corpus may originally have been made available for these challenges because there was no other remedy for in-prison abuses before the resurrection of

But we need not in this case explore the appropriate limits of habeas corpus as an alternative remedy to a proper action under § 1983. That question is not before us. What is involved here is the extent to which § 1983 is a permissible alternative to the traditional remedy of habeas corpus. Upon that question, we hold today that when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus. Accordingly, we reverse the judgment before us.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

The question presented by this case is one that I, like the Court of Appeals, had thought already resolved by our decision last Term in *Wilwording* v. *Swenson,* 404 U. S. 249 (1971). We held there that the Ku Klux Klan Act of 1871,[1] 42 U. S. C. § 1983; 28 U. S. C. § 1343 (3), confers jurisdiction on the United States District Courts to entertain a state prisoner's application for injunctive relief against allegedly unconstitutional conditions of confinement. See also *Humphrey* v. *Cady,* 405 U. S. 504, 516–517, n. 18 (1972); *Houghton* v. *Shafer,* 392 U. S. 639 (1968). At the same time, we held that "[t]he remedy provided by these Acts 'is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.' *Monroe* v. *Pape,* 365 U. S. 167, 183 (1961); *McNeese* v. *Board of Education,* 373 U. S. 668 (1963); *Damico* v. *California,*

---

§ 1983 in *Monroe* v. *Pape, supra,* and the affirmation of its availability for prisoners in *Cooper* v. *Pate,* 378 U. S. 546 (1964), and *Houghton* v. *Shafer,* 392 U. S. 639 (1968).

[1] Act of April 20, 1871, c. 22, § 1, 17 Stat. 13, Rev. Stat. § 1979.

389 U. S. 416 (1967). State prisoners are not held to any stricter standard of exhaustion than other civil rights plaintiffs." *Wilwording* v. *Swenson, supra,* at 251.

Regrettably, the Court today eviscerates that proposition by drawing a distinction that is both analytically unsound and, I fear, unworkable in practice. The net effect of the distinction is to preclude respondents from maintaining these actions under § 1983, leaving a petition for writ of habeas corpus the only available federal remedy. As a result, respondents must exhaust state remedies before their claims can be heard in a federal district court. I remain committed to the principles set forth in *Wilwording* v. *Swenson,* and I therefore respectfully dissent.

Respondents are three New York state prisoners who were placed in segregation and deprived of good-conduct-time credits as a result of prison disciplinary proceedings.[2] Each of the respondents commenced a *pro se*

---

[2] In his complaint, respondent Rodriguez alleged that correctional authorities had unlawfully canceled four months and 14 days of good-conduct-time credits, "[w]ithout affording plaintiff notice of any charges or a fair hearing at which plaintiff would have the assistance of counsel and the opportunity to confront witnesses, present evidence on his own behalf; and a specification of the grounds and underlying facts upon which the [authorities'] determination was based." App. 12a. And, further, that the cancellation was an act of harassment and persecution against him because of his failure to provide the authorities with certain information. *Id.,* at 13a.

Respondent Katzoff alleged that he was wrongfully placed in solitary confinement and deprived of good-conduct time as punishment for certain entries he had made in his diary. According to an affidavit he filed in District Court, the entries in question included a reference to one prison official as "a cigar-smoking S. O. B.," and to another as a "creep." App. 54a.

Respondent Kritsky stated in his complaint that correctional authorities had deprived him of good-time credits without notice of charges or a fair hearing, and as part of a "program of harassment

502

action in the United States District Court for the Northern District of New York by filing a combined civil rights complaint and petition for habeas corpus. In each case the District Court concluded that since the action was properly brought under § 1983, the prisoner was not bound by the exhaustion-of-state-remedies requirement of the federal habeas corpus statute.[3] On the merits of the three cases, the District Court held that state correctional authorities had deprived each respondent of rights guaranteed by the Fourteenth Amendment, and directed petitioner, the Commissioner of Correction, to restore the good-conduct-time credits that each of the respondents had lost.

By divided vote, two separate panels of the United States Court of Appeals for the Second Circuit reversed the judgments of the District Court with respect to respondents Rodriguez and Katzoff. Prior to decision in the case of respondent Kritsky, the Court of Appeals vacated the two earlier decisions and set all three cases for rehearing *en banc*. By a vote of 9–3, the Court affirmed the judgments of the District Court "upon consideration of the merits and upon the authority of *Wilwording* v. *Swenson*," decided by this Court while rehearing *en banc* was pending in the Court of Appeals. 456 F. 2d 79, 80 (1972). Although several of the judges who concurred in the decision candidly stated their mis-

---

and oppression directed at the plaintiff for having participated in a peaceful and non-violent work strike which ultimately culminated in legislation being passed . . . ." App. 100a.

[3] Title 28 U. S. C. § 2254 (b) provides:

"An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner."

givings about our holding in *Wilwording,* they felt "constrained," nonetheless, "to concur in affirming the orders of the district court." 456 F. 2d, at 81 (Friendly, C. J., concurring).[4]

The Court's conclusion that *Wilwording* is not controlling is assertedly justified by invocation of a concept, newly invented by the Court today, variously termed the "core of habeas corpus," the "heart of habeas corpus," and the "essence of habeas corpus." *Ante,* at 489, 498, and 484. In the Court's view, an action lying at the "core of habeas corpus" is one that "goes directly to the constitutionality of [the prisoner's] physical confinement itself and seeks either immediate release from that confinement or the shortening of its duration." *Id.,* at 489. With regard to such actions, habeas corpus is now considered the prisoner's exclusive remedy. In short, the Court does not graft the habeas corpus exhaustion requirement onto prisoner actions under the Ku Klux Klan Act, but it reaches what is functionally the same result by holding that the District Court's jurisdiction under the Act is in some instances displaced by the habeas corpus remedy. Henceforth, in such cases a prisoner brings an action in the nature of habeas corpus— or he brings no federal court action at all.

At bottom, the Court's holding today rests on an understandable apprehension that the no-exhaustion rule of § 1983 might, in the absence of some limitation, devour the exhaustion rule of the habeas corpus statute. The problem arises because the two statutes necessarily

---

[4] Indeed, Chief Judge Friendly suggested that the "proper course for the *in banc* court [would be] to affirm the orders of the district court without writing opinions." 456 F. 2d 79, 80. Judge Kaufman, who expressed no misgivings about our holding in *Wilwording* v. *Swenson,* 404 U. S. 249 (1971), indicated in his concurring opinion that he, too, thought the judgments of the District Court should have been summarily affirmed. *Id.,* at 82.

overlap. Indeed, every application by a state prisoner for federal habeas corpus relief against his jailers could, as a matter of logic and semantics, be viewed as an action under the Ku Klux Klan Act to obtain injunctive relief against "the deprivation," by one acting under color of state law, "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U. S. C. § 1983. To prevent state prisoners from nullifying the habeas corpus exhaustion requirement by invariably styling their petitions as pleas for relief under § 1983, the Court today devises an ungainly and irrational scheme that permits some prisoners to sue under § 1983, while others may proceed only by way of petition for habeas corpus. And the entire scheme operates in defiance of the purposes underlying both the exhaustion requirement of habeas corpus and the absence of a comparable requirement under § 1983.

I

At the outset, it is important to consider the nature of the line that the Court has drawn. The Court holds today that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Ante,* at 500. But, even under the Court's approach, there are undoubtedly some instances where a prisoner has the option of proceeding either by petition for habeas corpus or by suit under § 1983.

In *Johnson* v. *Avery,* 393 U. S. 483 (1969), we held that the writ of habeas corpus could be used to challenge allegedly unconstitutional conditions of confinement. Cf. *Ex parte Hull,* 312 U. S. 546, 549 (1941). And in *Wilwording* v. *Swenson, supra,* where the petitioners challenged "only their living conditions and disciplinary

measures while confined in maximum security at Missouri State Penitentiary," *id.*, at 249, we held explicitly that their claims were cognizable in habeas corpus. These holdings illustrate the general proposition that "[a]ny unlawful restraint of personal liberty may be inquired into on habeas corpus. . . . This rule applies although a person is in lawful custody. His conviction and incarceration deprive him only of such liberties as the law has ordained he shall suffer for his transgressions." *Coffin* v. *Reichard,* 143 F. 2d 443, 445 (CA6 1944); cf. *In re Bonner,* 151 U. S. 242 (1894).[5]

Yet even though a prisoner may challenge the conditions of his confinement by petition for writ of habeas corpus, he is not precluded by today's opinion from raising the same or similar claim, without exhaustion of state remedies, by suit under the Ku Klux Klan Act, provided he attacks only the conditions of his confinement and not its fact or duration. To that extent, at least, the Court leaves unimpaired our holdings in *Wilwording* v. *Swenson, supra,* and the other cases in which we have upheld the right of prisoners to sue their jailers under § 1983 without exhaustion of state remedies.[6]   *Humphrey* v. *Cady,* 405 U. S., at 516–517, n. 18; *Houghton* v. *Shafer,* 392 U. S. 639 (1968).[7]   Nor do I read today's

_____

[5] See Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1079–1087 (1970).

[6] Indeed, the Court expressly views our prior cases as establishing "that a § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody. Upon that understanding, we reaffirm those holdings." *Ante,* at 499.

[7] In addition to the cases cited in text, in which we explicitly indicated that a prisoner might proceed under § 1983 without exhausting state remedies, we have also repeatedly upheld a prisoner's right to challenge the conditions of his confinement under § 1983, without any suggestion that exhaustion of state remedies is a necessary precondition to the bringing of the suit. See *Haines* v. *Kerner,* 404

opinion as rejecting, or even questioning, the rationale of numerous lower court decisions authorizing challenges to prison conditions by suit under § 1983.[8] Accordingly, one can only conclude that some instances remain where habeas corpus provides a supplementary but not an exclusive remedy—or, to put it another way, where an action may properly be brought in habeas corpus, even though it is somehow sufficiently distant from the "core of habeas corpus" to avoid displacing concurrent jurisdiction under the Ku Klux Klan Act. In such a case, a state prisoner retains the option of forgoing the habeas corpus remedy in favor of suit under § 1983.

## II

Putting momentarily to one side the grave analytic shortcomings of the Court's approach, it seems clear that the scheme's unmanageability is sufficient reason to condemn it. For the unfortunate but inevitable legacy of today's opinion is a perplexing set of uncertainties and anomalies. And the nub of the problem is the definition of the Court's new-found and essentially ethereal concept, the "core of habeas corpus." [9]

---

U. S. 519 (1972); *Cruz v. Beto*, 405 U. S. 319 (1972); *Younger v. Gilmore*, 404 U. S. 15 (1971); *Cruz v. Hauck*, 404 U. S. 59 (1971); *McDonald v. Board of Election*, 394 U. S. 802 (1969); *Lee v. Washington*, 390 U. S. 333 (1968); *Cooper v. Pate*, 378 U. S. 546 (1964).

[8] See, *e. g., Sostre v. McGinnis*, 442 F. 2d 178, 182 (CA2 1971) (conditions of segregated confinement); *Jackson v. Bishop*, 404 F. 2d 571 (CA8 1968) (cruel and unusual punishment); *Hirons v. Director*, 351 F. 2d 613 (CA4 1965) (medical treatment); *Pierce v. LaVallee*, 293 F. 2d 233 (CA2 1961) (religious freedom); *Edwards v. Schmidt*, 321 F. Supp. 68 (WD Wis. 1971) (transfer of juveniles to adult facility); *Hancock v. Avery*, 301 F. Supp. 786 (MD Tenn. 1969) (solitary confinement).

[9] Indeed, one must inevitably wonder whether the "core" of habeas corpus will not prove as intractable to definition as the "core" of

A prisoner is unlucky enough to have his action fall within the core of habeas corpus whenever he challenges the fact or duration of his confinement. For example, an attack on the validity of conviction or sentence is plainly directed at the fact or duration of confinement, and the prisoner can therefore proceed only by petition for habeas corpus. Similarly, where prisoners allege, as here, that "the deprivation of their good-conduct-time credits [is] causing or [will] cause them to be in illegal physical confinement, *i. e.,* that once their conditional-release date [has] passed, any further detention of them in prison [will be] unlawful," their claim falls within the core. And "[e]ven if the restoration of the respondents' credits would not have resulted in their immediate release, but only in shortening the length of their actual confinement in prison," jurisdiction under § 1983 is displaced by the habeas corpus remedy. *Ante,* at 487.

At the opposite end of the spectrum from an attack on the conviction itself or on the deprivation of good-time credits is a prisoner's action for monetary damages against his jailers. "If a state prisoner is seeking damages," the Court makes clear, he is seeking "something other than immediate or more speedy release—the traditional purpose of habeas corpus. In the case of a damages claim, habeas corpus is *not* an appropriate or available federal remedy. Accordingly, as petitioners themselves concede, a damages action by a state prisoner could be brought under [§ 1983] in federal court without any requirement of prior exhaustion of state remedies." *Ante,* at 494 (emphasis in original).

Between a suit for damages and an attack on the conviction itself or on the deprivation of good-time credits

---

another concept that some of us have struggled to define. Cf. *Jacobellis* v. *Ohio,* 378 U. S. 184, 197 (1964) (STEWART, J., concurring).

are cases where habeas corpus is an appropriate and available remedy, but where the action falls outside the "core of habeas corpus" because the attack is directed at the conditions of confinement, not at its fact or duration. Notwithstanding today's decision, a prisoner may challenge, by suit under § 1983, prison living conditions and disciplinary measures,[10] or confiscation of legal materials,[11] or impairment of the right to free exercise of religion,[12] even though federal habeas corpus is available as an alternative remedy. It should be plain enough that serious difficulties will arise whenever a prisoner seeks to attack in a single proceeding both the conditions of his confinement and the deprivation of good-time credits. And the addition of a plea for monetary damages exacerbates the problem.

If a prisoner's sole claim is that he was placed in solitary confinement pursuant to an unconstitutional disciplinary procedure,[13] he can obtain federal injunctive relief and monetary damages in an action under § 1983. The unanswered question is whether he loses the right to proceed under § 1983 if, as punishment for his alleged misconduct, his jailers have not only subjected him to unlawful segregation and thereby inflicted an injury that is compensable in damages, but have compounded the wrong by improperly depriving him of good-time credits. Three different approaches are possible.

First, we might conclude that jurisdiction under § 1983 is lost whenever good-time credits are involved, even where the action is based primarily on the need for monetary relief or an injunction against continued segregation. If that is the logic of the Court's opinion, then the scheme creates an undeniable, and in all likelihood

---

[10] E. g., *Wilwording* v. *Swenson*, 404 U. S. 249 (1971).

[11] E. g., *Houghton* v. *Shafer*, 392 U. S. 639 (1968).

[12] E. g., *Cooper* v. *Pate*, 378 U. S. 546 (1964).

[13] E. g., *Haines* v. *Kerner*, 404 U. S. 519 (1972).

irresistible, incentive for state prison officials to defeat the jurisdiction of the federal courts by adding the deprivation of good-time credits to whatever other punishment is imposed. And if all of the federal claims must be held in abeyance pending exhaustion of state remedies, a prisoner's subsequent effort to assert a damages claim under § 1983 might arguably be barred by principles of res judicata.[14] To avoid the loss of his damages claim, a prisoner might conclude that he should make no mention of the good-time issue and instead seek only damages in a § 1983 action. That approach (assuming it would not be disallowed as a subterfuge to circumvent the exhaustion requirement) creates its own distressing possibilities. For, having obtained decision in federal court on the issue of damages, the prisoner would presumably be required to repair to state court in search of his lost good-time credits, returning once again to federal court if his state court efforts should prove unavailing.

Moreover, a determination that no federal claim can be raised where good-time credits are at stake would give rise to a further anomaly. If the prisoner is confined in an institution that does not offer good-time credits, and therefore cannot withdraw them,[15] his prison-

---

[14] That assumes, of course, that a damages claim cannot be raised on habeas corpus, *ante,* at 494, and that the special res judicata rules of habeas corpus would not apply. In any case, we have never held that the doctrine of res judicata applies, in whole or in part, to bar the relitigation under § 1983 of questions that might have been raised, but were not, or that were raised and considered in state court proceedings. The Court correctly notes that a number of lower courts have assumed that the doctrine of res judicata is fully applicable to cases brought under § 1983. But in view of the purposes underlying enactment of the Act—in particular, the congressional misgivings about the ability and inclination of state courts to enforce federally protected rights, see *infra,* at 515–518—that conclusion may well be in error.

[15] Brief for Respondents 25, citing N. Y. Penal Law § 75.00 and N. Y. Correc. Law §§ 803, 804 (reformatory-sentenced prisoners).

conditions claims could always be raised in a suit under § 1983. On the other hand, an inmate in an institution that uses good-time credits as reward and punishment, who seeks a federal hearing on the identical legal and factual claims, would normally be required to exhaust state remedies and then proceed by way of federal habeas corpus. The rationality of that difference in treatment is certainly obscure. Yet that is the price of permitting the availability of a federal forum to be controlled by the happenstance (or stratagem) that good-time credits are at stake.

As an alternative, we might reject outright the premises of the first approach and conclude that a plea for money damages or for an injunction against continued segregation is sufficient to bring all related claims, including the question of good-time credits, under the umbrella of § 1983. That approach would, of course, simplify matters considerably. And it would make unnecessary the fractionation of the prisoner's claims into a number of different issues to be resolved in duplicative proceedings in state and federal courts. Nevertheless, the approach would seem to afford a convenient means of sidestepping the basic thrust of the Court's opinion, and we could surely expect state prisoners routinely to add to their other claims a plea for monetary relief. So long as the prisoner could formulate at least a colorable damages claim, he would be entitled to litigate all issues in federal court without first exhausting state remedies.

In any event, the Court today rejects, perhaps for the reasons suggested above, both of the foregoing positions. Instead, it holds that insofar as a prisoner's claim relates to good-time credits, he is required to exhaust state remedies; but he is not precluded from simultaneously litigating in federal court, under § 1983, his claim for monetary damages or an injunction against continued segregation. *Ante,* at 499 n. 14. Under that approach,

state correctional authorities have no added incentive to withdraw good-time credits, since that action cannot, standing alone, keep the prisoner out of federal court. And, at the same time, it does not encourage a prisoner to assert an unnecessary claim for damages or injunctive relief as a means of bringing his good-time claim under the purview of § 1983. Nevertheless, this approach entails substantial difficulties—perhaps the greatest difficulties of the three. In the first place, its extreme inefficiency is readily apparent. For in many instances a prisoner's claims will be under simultaneous consideration in two distinct forums, even though the identical legal and factual questions are involved in both proceedings. Thus, if a prisoner's punishment for some alleged misconduct is both a term in solitary and the deprivation of good-time credits, and if he believes that the punishment was imposed pursuant to unconstitutional disciplinary procedures, he can now litigate the legality of those procedures simultaneously in state court (where he seeks restoration of good-time credits) and in federal court (where he seeks damages or an injunction against continued segregation). Moreover, if the federal court is the first to reach decision, and if that court concludes that the procedures are, in fact, unlawful, then the entire state proceeding must be immediately aborted, even though the state court may have devoted substantial time and effort to its consideration of the case. By the same token, if traditional principles of res judicata are applicable to suits under § 1983, see *supra*, at 509 n. 14, the prior conclusion of the state court suit would effectively set at naught the entire federal court proceeding. This is plainly a curious prescription for improving relations between state and federal courts.

Since some of the ramifications of this new approach are still unclear, the unfortunate outcome of today's decision—an outcome that might not be immediately

surmised from the seeming simplicity of the basic concept, the "core of habeas corpus"—is almost certain to be the further complication of prison-conditions litigation. In itself that is disquieting enough. But it is especially distressing that the remaining questions will have to be resolved on the basis of pleadings, whether in habeas corpus or suit under § 1983, submitted by state prisoners, who will often have to cope with these questions without even minimal assistance of counsel.

## III

The Court's conclusion that respondents must proceed by petition for habeas corpus is unfortunate, not only because of the uncertainties and practical difficulties to which the conclusion necessarily gives rise, but also because it derives from a faulty analytic foundation. The text of § 1983 carries no explanation for today's decision; prisoners are still, I assume, "persons" within the meaning of the statute. Moreover, prior to our recent decisions expanding the definition of "custody," [16] and abandoning the "prematurity" doctrine,[17] it is doubtful that habeas corpus would even have provided them a remedy. Since their claims could not, in all likelihood, have been heard on habeas corpus at the time the present habeas corpus statute was enacted in 1867,[18] or at the

[16] See, e. g., Hensley v. Municipal Court, ante, p. 345; Carafas v. LaVallee, 391 U. S. 234 (1968); Jones v. Cunningham, 371 U. S. 236 (1963). These decisions have established habeas corpus as an available and appropriate remedy in situations where the petitioner's challenge is not merely to the fact of his confinement.

[17] See Peyton v. Rowe, 391 U. S. 54 (1968), overruling McNally v. Hill, 293 U. S. 131 (1934). Under the prematurity doctrine, a prisoner could not have attacked the deprivation of good-conduct-time credits where restoration of the credits would shorten the length of his confinement but not bring it immediately to an end.

[18] Act of Feb. 5, 1867, c. 28, § 1, 14 Stat. 385, now 28 U. S. C. § 2241 (c)(3). Prior to that enactment, the writ was made available to

time the exhaustion doctrine was first announced in *Ex parte Royall,* 117 U. S. 241 (1886), or at the time the requirement was codified in 1948,[19] it is surely hard to view these acts as a determination to preclude suit under § 1983 and leave habeas corpus the prisoner's only remedy. Nevertheless, to prevent state prisoners from invoking the jurisdictional grant of § 1983 as a means of circumventing the exhaustion requirement of the habeas corpus statute, the Court finds it necessary to hold today that in this one instance jurisdiction under § 1983 is displaced by the habeas corpus remedy.

The concern that § 1983 not be used to nullify the habeas corpus exhaustion doctrine is, of course, legitimate. But our effort to preserve the integrity of the doctrine must rest on an understanding of the purposes that underlie it. In my view, the Court misapprehends these fundamental purposes and compounds the problem by paying insufficient attention to the reasons why exhaustion of state remedies is not required in suits under § 1983. As a result, the Court mistakenly concludes that allowing suit under § 1983 would jeopardize the purposes of the exhaustion rule.

By enactment of the Ku Klux Klan Act in 1871, and again by the grant in 1875 of original federal-question jurisdiction to the federal courts,[20] Congress recognized important interests in permitting a plaintiff to choose a federal forum in cases arising under

special categories of state prisoners. Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1048 n. 46 (1970).

[19] Act of June 25, 1948, c. 646, 62 Stat. 967, now 28 U. S. C. § 2254 (b), (c). It is agreed that the purpose of the 1948 enactment was to codify the doctrine as formulated in *Ex parte Hawk,* 321 U. S. 114 (1944), and other decisions of this Court.

[20] Act of Mar. 3, 1875, c. 137, § 1, 18 Stat. 470, now 28 U. S. C. § 1331.

federal law. "In thus expanding federal judicial power, Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims. Plainly, escape from that duty is not permissible merely because state courts also have the solemn responsibility, equally with the federal courts, '. . . to guard, enforce, and protect every right granted or secured by the Constitution of the United States . . . ,' *Robb* v. *Connolly,* 111 U. S. 624, 637." *Zwickler* v. *Koota,* 389 U. S. 241, 248 (1967).

This grant of jurisdiction was designed to preserve and enhance the expertise of federal courts in applying federal law; to achieve greater uniformity of results, cf. *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 347–348 (1816); and, since federal courts are "more likely to apply federal law sympathetically and understandingly than are state courts," ALI, Study of the Division of Jurisdiction Between State and Federal Courts 166 (1969), to minimize misapplications of federal law. See generally *id.,* at 165–167.

In the service of the same interests, we have taken care to emphasize that there are

> "fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims. Such a result would be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts, and with the principle that 'When a Federal court is properly appealed to in a case over which it has

by law jurisdiction, it is its duty to take such juris-
diction . . . . The right of a party plaintiff to
choose a Federal court where there is a choice cannot
be properly denied.' *Willcox* v. *Consolidated Gas
Co.*, 212 U. S. 19, 40." *England* v. *Louisiana State
Board of Medical Examiners*, 375 U. S. 411, 415
(1964).

We have also recognized that review by this Court of
state decisions, "even when available by appeal rather
than only by discretionary writ of certiorari, is an inade-
quate substitute for the initial District Court deter-
mination . . . to which the litigant is entitled in the
federal courts." *Id.*, at 416. The federal courts are,
in short, the "primary and powerful reliances for vin-
dicating every right given by the Constitution, the
laws, and treaties of the United States." F. Frankfurter
& J. Landis, The Business of the Supreme Court: A
Study in the Federal Judicial System 65 (1928). See
*England* v. *Louisiana State Board of Medical Examiners,
supra*, at 415.

These considerations, applicable generally in cases
arising under federal law, have special force in the con-
text of the Ku Klux Klan Act of 1871. In a suit to en-
force fundamental constitutional rights, the plaintiff's
choice of a federal forum has singular urgency.[21] The
statutory predecessor to § 1983 was, after all, designed
"to afford a federal right in federal courts because, by
reason of prejudice, passion, neglect, intolerance or
otherwise, state laws might not be enforced and the
claims of citizens to the rights, privileges, and immunities
guaranteed by the Fourteenth Amendment might be
denied by the state agencies." *Monroe* v. *Pape,* 365

---

[21] See generally Chevigny, Section 1983 Jurisdiction: A Reply,
83 Harv. L. Rev. 1352, 1356–1358 (1970).

U. S. 167, 180 (1961). And the statute's legislative history

> "makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts. . . . The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative or judicial.' *Ex parte Virginia* [100 U. S. 339, 346 (1880)]." *Mitchum* v. *Foster,* 407 U. S. 225, 242 (1972).

See also *District of Columbia* v. *Carter,* 409 U. S. 418, 426–428 (1973).[22]

---

[22] See, *e. g.,* remarks of Rep. Coburn:

"The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily." Cong. Globe, 42d Cong., 1st Sess., 460 (1871).

And the remarks of Sen. Pratt:

"[O]f the hundreds of outrages committed upon loyal people through the agency of this Ku Klux organization not one has been punished. This defect in the administration of the laws does not extend to other cases. Vigorously enough are the laws enforced against Union people. They only fail in efficiency when a man of known Union sentiments, white or black, invokes their aid. Then Justice closes the door of her temples." *Id.,* at 505.

It is against this background that we have refused to require exhaustion of state remedies by civil rights plaintiffs.[23] Plainly, "[w]e would defeat [the purposes of § 1983] if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court." *McNeese* v. *Board of Education*, 373 U. S. 668, 672 (1963). "We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum." *Stapleton* v. *Mitchell*, 60 F. Supp. 51, 55 (Kan. 1945); quoted with approval in *Zwickler* v. *Koota*, 389 U. S., at 248; and *McNeese* v. *Board of Education, supra*, at 674 n. 6. See also *Monroe* v. *Pape, supra*, at 183; *Moreno* v. *Henckel*, 431 F. 2d 1299, 1303–1307 (CA5 1970); H. Friendly, Federal Jurisdiction: A General View 102–103 (1973).

Our determination that principles of federalism do not require the exhaustion of state remedies in cases brought under the Ku Klux Klan Act holds true even where the state agency or process under constitutional attack is intimately tied to the state judicial machinery. Cf. *Lynch* v. *Household Finance Corp.*, 405 U. S. 538 (1972). Indeed, only last Term we held in *Mitchum* v. *Foster, supra*, that § 1983 operates as an exception to the federal anti-injunction statute, 28 U. S. C. § 2283, which prohibits federal court injunctions against ongoing state judicial proceedings and which is designed to prevent

---

[23] See, *e. g., Wilwording* v. *Swenson, supra; King* v. *Smith*, 392 U. S. 309, 312 n. 4 (1968); *Monroe* v. *Pape*, 365 U. S. 167 (1961); *Bacon* v. *Rutland R. Co.*, 232 U. S. 134 (1914); cf. Note, Exhaustion of State Remedies Under the Civil Rights Act, 68 Col. L. Rev. 1201 (1968).

"needless friction between state and federal courts." *Oklahoma Packing Co.* v. *Gas Co.*, 309 U. S. 4, 9 (1940). Although the anti-injunction statute rests in part on considerations as fundamental as the "constitutional independence of the States and their courts," *Atlantic C. L. R. Co.* v. *Brotherhood of Locomotive Engineers*, 398 U. S. 281, 287 (1970), and although exceptions will "not be enlarged by loose statutory construction," *ibid.*, we nevertheless unanimously concluded that § 1983 is excepted from the statute's prohibition—that the anti-injunction statute does not, in other words, displace federal jurisdiction under the Ku Klux Klan Act.

In sum, the absence of an exhaustion requirement in § 1983 is not an accident of history or the result of careless oversight by Congress or this Court. On the contrary, the no-exhaustion rule is an integral feature of the statutory scheme. Exhaustion of state remedies is not required precisely because such a requirement would jeopardize the purposes of the Act. For that reason, the imposition of such a requirement, even if done indirectly by means of a determination that jurisdiction under § 1983 is displaced by an alternative remedial device, must be justified by a clear statement of congressional intent, or, at the very least, by the presence of the most persuasive considerations of policy. In my view, no such justification can be found.

Crucial to the Court's analysis of the case before us is its understanding of the purposes that underlie the habeas corpus exhaustion requirement. But just as the Court pays too little attention to the reasons for a no-exhaustion rule in actions under § 1983, it also misconceives the purposes of the exhaustion requirement in habeas corpus. As a result, the Court reaches what seems to me the erroneous conclusion that the purposes of the exhaustion requirement are fully implicated in

respondents' actions, even though respondents sought to bring these actions under § 1983.

"The rule of exhaustion in federal habeas corpus actions is," according to today's opinion, "rooted in considerations of federal-state comity. That principle was defined in *Younger v. Harris*, 401 U. S. 37, 44 (1971), as 'a proper respect for state functions,' and it has as much relevance in areas of particular state administrative concern as it does where state judicial action is being attacked." *Ante,* at 491. Moreover, the Court reasons that since the relationship between state prisoners and state officers is especially intimate, and since prison issues are peculiarly within state authority and expertise, "the States have an important interest in not being bypassed in the correction of those problems." *Ante,* at 492. With all respect, I cannot accept either the premises or the reasoning that lead to the Court's conclusion.

Although codified in the habeas corpus statute in 1948, 28 U. S. C. § 2254 (b), the exhaustion requirement is a "judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a 'swift and imperative remedy in all cases of illegal restraint or confinement.' *Secretary of State for Home Affairs* v. *O'Brien,* [1923] A. C. 603, 609 (H. L.)." *Braden* v. *30th Judicial Circuit,* 410 U. S. 484, 490 (1973). The indisputable concern of all our decisions concerning the doctrine has been the relationship "between the *judicial tribunals* of the Union and of the States . . . . [T]he public good requires that those relations be not disturbed by unnecessary conflict between *courts* equally bound to guard and protect rights secured by the Constitution." *Ex parte Royall,* 117 U. S., at 251 (emphasis added). *Ex parte Royall* is, of course, the germinal case, and its concern with the relations between state

and federal *courts* is mirrored in our subsequent decisions. See, *e. g., Braden* v. *30th Judicial Circuit, supra,* at 489–490; *Baker* v. *Grice,* 169 U. S. 284, 291 (1898); *Ex parte Hawk,* 321 U. S. 114, 116–117 (1944); cf. *Sostre* v. *McGinnis,* 442 F. 2d 178, 182 (CA2 1971); *Edwards* v. *Schmidt,* 321 F. Supp. 68, 74–75 (WD Wis. 1971). We have grounded the doctrine squarely on the view that "it would be unseemly in our dual system of government for a federal district court to upset a *state court conviction* without an opportunity to the state courts to correct a constitutional violation." *Fay* v. *Noia,* 372 U. S. 391, 419–420 (1963) (emphasis added), quoting from *Darr* v. *Burford,* 339 U. S. 200, 204 (1950). See Parker, Limiting the Abuse of Habeas Corpus, 8 F. R. D. 171, 172–173 (1948).

That is not to say, however, that the purposes of the doctrine are implicated only where an attack is directed at a state court *conviction* or *sentence*. *Ex parte Royall* itself did not involve a challenge to a state conviction, but rather an effort to secure a prisoner's release on habeas corpus "in advance of his trial in the [state] court in which he [was] indicted." *Id.,* at 253. But there, too, the focus was on relations between the state and federal *judiciaries*. It is a fundamental purpose of the exhaustion doctrine to preserve the "orderly administration of state judicial business, preventing the interruption of state adjudication by federal habeas proceedings. It is important that petitioners reach state appellate courts, which can develop and correct errors of state and federal law and most effectively supervise and impose uniformity on trial courts." Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1094 (1970). Significantly, the identical interest in preserving the integrity and orderliness of judicial proceedings gives rise to the application of the exhaustion doctrine even where a federal prisoner attacks the action of

a federal court. *Id.*, at 1094–1095. See, *e. g., Bowen* v. *Johnston,* 306 U. S. 19, 26–27 (1939). In such a case, considerations of federalism obviously do not come into play. Yet the exhaustion requirement is nevertheless applied in order to prevent the disruption of the orderly conduct of judicial administration.

With these considerations in mind, it becomes clear that the Court's decision does not serve the fundamental purposes behind the exhaustion doctrine. For although respondents were confined pursuant to the judgment of a state judicial tribunal, their claims do not relate to their convictions or sentences, but only to the administrative action of prison officials who subjected them to allegedly unconstitutional treatment, including the deprivation of good-time credits. This is not a case, in other words, where federal intervention would interrupt a state proceeding or jeopardize the orderly administration of state judicial business. Nor is it a case where an action in federal court might imperil the relationship between state and federal courts. The "regularity of proceedings had in courts of coordinate jurisdiction," Parker, *supra,* at 172–173, is not in any sense at issue.

To be sure, respondents do call into question the constitutional validity of action by state officials, and friction between those officials and the federal court is by no means an inconceivable result. But standing alone, that possibility is simply not enough to warrant application of an exhaustion requirement. First, while we spoke in *Younger* v. *Harris,* 401 U. S. 37, 44 (1971), of the need for federal courts to maintain a "proper respect for state functions," neither that statement nor our holding there supports the instant application of the exhaustion doctrine. Our concern in *Younger* v. *Harris* was the "longstanding public policy against federal court interference with *state court proceedings," id.,* at 43 (emphasis added), by means of a federal injunction

against the continuation of those proceedings. *Younger* is thus an instructive illustration of the very proposition that the Court regrettably misconstrues. It does not in any sense demand, or even counsel, today's decision.

Second, the situation that exists in the case before us—an attack on state administrative rather than judicial action—is the stereotypical situation in which relief under § 1983 is authorized. See, *e. g., McNeese* v. *Board of Education,* 373 U. S. 668 (1963) (attack on school districting scheme); *Damico* v. *California,* 389 U. S. 416 (1967) (attack on welfare requirements); *Monroe* v. *Pape,* 365 U. S., at 183 (attack on police conduct). In each of these cases the exercise of federal jurisdiction was potentially offensive to the State and its officials. In each of these cases the attack was directed at an important state function in an area in which the State has wide powers of regulation. Yet in each of these cases we explicitly held that exhaustion of state remedies was not required. And in comparable cases we have taken pains to insure that the abstention doctrine is not used to defeat the plaintiff's initial choice of a federal forum, see, *e. g., Zwickler* v. *Koota,* 389 U. S., at 249, even though the plaintiff could reserve the right to litigate the federal claim in federal court at the conclusion of the state proceeding. *England* v. *Louisiana State Board of Medical Examiners.* 375 U. S. 411 (1964). Like Judge Kaufman, who concurred in the affirmance of the cases now before us, "I cannot believe that federal jurisdiction in cases involving prisoner rights is any more offensive to the state than federal jurisdiction in the areas" where the exhaustion requirement has been explicitly ruled inapplicable. 456 F. 2d, at 82.

Third, if the Court is correct in assuming that the exhaustion requirement must be applied whenever federal jurisdiction might be a source of substantial friction with the State, then I simply do not understand why the

Court stops where it does in rolling back the district courts' jurisdiction under § 1983. Application of the exhaustion doctrine now turns on whether or not the action is directed at the fact or duration of the prisoner's confinement. It seems highly doubtful to me that a constitutional attack on prison conditions is any less disruptive of federal-state relations than an attack on prison conditions joined with a plea for restoration of good-time credits. Chief Judge Friendly expressed the view, as did the judges in dissent below, that "petitions of state prisoners complaining of the time or conditions of their confinement have the same potentialities for exacerbating federal-state relations as petitions attacking the validity of their confinement—perhaps even more." 456 F. 2d, at 80. Yet the Court holds today that exhaustion is required where a prisoner attacks the deprivation of good-time credits, but not where he challenges only the conditions of his confinement. It seems obvious to me that both of those propositions cannot be correct.

Finally, the Court's decision may have the ironic effect of turning a situation where state and federal courts are not initially in conflict into a situation where precisely such conflict does result. Since respondents' actions would neither interrupt a state judicial proceeding nor, even if successful, require the invalidation of a state judicial decision, "[t]he question is simply whether one court or another is going to decide the case." Note, Exhaustion of State Remedies Under the Civil Rights Act, 68 Col. L. Rev. 1201, 1205–1206 (1968). If we had held, consistently with our prior cases, that the plaintiff has the right to choose a federal forum, the exercise of that right would not offend or embarrass a state court with concurrent jurisdiction. Now, however, a prisoner who seeks restoration of good-time credits must proceed first in state court, although he has the option of petitioning the federal court for relief if his state suit is unsuccessful.

If the prisoner does resort to a federal habeas corpus action, the potential for friction with the State is certain to increase. The State is likely, after all, to derive little pleasure from the federal court's effort to determine whether there was "either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U. S. C. § 2254 (b). And since it is the validity of the state court's decision that is placed in issue, the State will have to endure a federal court inquiry into whether the State's factfinding process was adequate to afford a full and fair hearing, 28 U. S. C. § 2254 (d)(2), whether the petitioner was denied due process of law in the state court proceeding, *id.*, § 2254 (d)(7), and whether the state court's factual determinations were fairly supported by the record, *id.*, § 2254 (d)(8). Cf. *Townsend* v. *Sain,* 372 U. S. 293 (1963). Since none of these questions would even arise if the Court had held these actions properly brought under § 1983, it seems a good deal premature to proclaim today's decision a major victory in our continuing effort to achieve a harmonious and healthy federal-state system.

## IV

In short, I see no basis for concluding that jurisdiction under § 1983 is, in this instance, pre-empted by the habeas corpus remedy. Respondents' effort to bring these suits under the provisions of the Ku Klux Klan Act should not be viewed as an attempted circumvention of the exhaustion requirement of the habeas corpus statute, for the effort does not in any sense conflict with the policies underlying that requirement.[24] By means of

---

[24] In a case where the habeas corpus statute does provide an available and appropriate remedy, and where a prisoner's selection of an alternative remedy would undermine and effectively nullify the habeas corpus exhaustion requirement, it would, of course, be

these suits, they demand an immediate end to action under color of state law that has the alleged effect of violating fundamental rights guaranteed by the Federal Constitution. The Ku Klux Klan Act was designed to afford an expeditious federal hearing for the resolution of precisely such claims as these. Since I share the Court's view that exhaustion of state judicial remedies is not required in any suit properly brought in federal court under § 1983, *ante,* at 477, and since I am convinced that respondents have properly invoked the jurisdictional grant of § 1983, I would affirm the judgment of the Court of Appeals.

---

possible to view the suit as an impermissible attempt to circumvent that requirement. But by the same token, if a prisoner seeks to challenge only the conditions of his confinement—in which case the purposes underlying the exhaustion rule do not come into play—his filing should be considered a complaint under § 1983 even if the prisoner terms it a petition for habeas corpus. That result is consistent with the view that prisoner petitions should be liberally considered, *Price* v. *Johnston,* 334 U. S. 266 (1948), and it represents no threat to the integrity of the exhaustion doctrine. Nothing in today's decision suggests that the district courts should follow any other practice.