**Enrique C. LERMA, Petitioner-Appellant,**

v.

**W. J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent-Appellee.**

No. 77–2798.

United States Court of Appeals, Fifth Circuit.

Dec. 11, 1978.

Rehearing Denied Jan. 10, 1979.

Rehearing and Rehearing En Banc Denied Jan. 31, 1979.

Enrique C. Lerma, pro se.

Larry G. Barbour, Houston, Tex. (Court-appointed), for petitioner-appellant.

John L. Hill, Atty. Gen., Robert E. De Long, Jr., David M. Kendall, Jr., Joe B. Dibrell, Jr., Douglas M. Becker, Asst. Attys. Gen., Austin, Tex., for respondent-appellee.

Before COLEMAN, GEE and RUBIN, Circuit Judges.

PER CURIAM:

Enrique Lerma, a Texas convict, having lost at an October, 1975 prison disciplinary hearing 360 days of "good time" credit and the right to accrue further good time, challenges the procedural protections afforded him at that hearing as constitutionally in-

sufficient.[1] His hearing occurred after the Supreme Court, in *Wolff v. McDonnell*, 1974, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, held the Due Process clause of the Fourteenth Amendment applicable to the revocation of good time through state prison disciplinary proceedings. The District Court considered Lerma's application for habeas corpus on its merits and denied relief.

On October 8, 1974, while Lerma and a group of other prisoners were weeding a soybean patch, an inmate shouted an obscenity at their supervisor, Shine. Shine said something to Lerma, indicating his belief that Lerma had shouted the obscenity. Lerma denied it, and Shine ordered him back to work. There were further words between the two: Lerma says he asked that Shine not shout at him; Shine says Lerma was disrespectful and disobeyed the order to return to work. Shine ordered Lerma removed from the squad, and reported the incident to another officer, who took Lerma to "administrative segregation." Later that day, Lerma was brought before his unit's disciplinary committee, and was charged with "Laziness: Failure to Work" and "Disrespectful Attitude," both in violation of prison regulations. He was sentenced to 15 days in solitary confinement, forfeiture of 360 days of good time, and demotion from Class I to Class III status, which prevented him, until reclassified, from accruing further good time. It is uncontroverted that Lerma received no more than several hours' notice of his hearing. At the hearing, Shine's report was introduced and Lerma gave his version of the occurrence.

Under the then existing TDC regulations Lerma could have appealed the findings made or the penalties assessed at his hearing to the TDC Director. *Upon appeal the Director could have revised either the findings or the penalty.* Lerma did not appeal.

Twenty-one months later, June, 1976, Lerma unsuccessfully sought relief in state court. On October 28, 1976, *two years after*

the episode in the soybean field, Lerma filed his federal habeas petition.

In *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Supreme Court said:

> It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures than the administration of its prisons. The relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen. For state prisoners, eating, sleeping, dressing, washing, working, and playing are all done under the watchful eye of the State, and so the possibilities for litigation under the Fourteenth Amendment are boundless. What for a private citizen would be a dispute with his landlord, with his employer, with his tailor, with his neighbor, or with his banker becomes, for the prisoner, a dispute with the State. Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems. Moreover, because most potential litigation involving state prisoners arises on a day-to-day basis, it is most efficiently and properly handled by the state administrative bodies and state courts, which are, for the most part, familiar with the grievances of state prisoners and in a better physical and practical position to deal with those grievances.

93 S.Ct. at 1837.

Immediately prior to this exposition of the law the Supreme Court had said:

> The rule of exhaustion in federal habeas corpus actions is rooted in considerations of federal-state comity. That principle was defined in *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971), as "a proper respect for state functions," and it has as much

---

1. On September 14, 1971, a jury found Lerma, a known user of heroin, guilty of possessing heroin and assessed his punishment at confinement for 20 years in the Texas Department of Corrections. The conviction was affirmed, *Lerma v. State*, Tex.Cr.App., 491 S.W.2d 152 (1973).

relevance in areas of particular state administrative concern as it does where state judicial action is being attacked.

*Rodriguez* involved the same question we have here, that is, the loss of good time credit because of a violation of prison rules and regulations. We must therefore adhere to the view that in habeas corpus cases the exhaustion principle has as much relevance in areas of *administrative concern* as it does where state judicial action is being attacked.

It is admitted, as it has to be, that Lerma had an available administrative remedy had he seen fit to exercise it. He could have appealed to the Director, who was possessed of the authority to revise either findings or penalty. It is now argued, however, that such an appeal would *likely* have been futile. It seems, however, that this argument is speculative. Had an appeal been ignored, or decided adversely to Lerma, we might have been provided with solid ground upon which to justify federal intervention in state prison administration.

Since that has been prevented by Lerma's failure to exhaust his clearly available administrative remedies we may not reverse the denial of habeas corpus relief.

We further observe, as the Supreme Court did in *Rodriguez* (93 S.Ct. 1832–1833) that the Habeas Corpus Statute, 28 U.S.C. § 2254(c), specifies that an applicant shall not be deemed to have exhausted the remedies available in the courts of the State if he has the right under the law of the State to raise *by any available procedure* (emphasis added) the question presented.

We affirm the denial of federal habeas corpus relief and remand the case to allow

Lerma, if he so desires, to present his appeal to the Texas Director.

AFFIRMED and REMANDED.

ALVIN B. RUBIN, Circuit Judge, dissenting:

Respectfully, I must dissent from the conclusion my brethren have reached. Lerma has exhausted his state court judicial remedies. In that proceeding, the warden did not suggest that he should first have exhausted his state administrative remedies. On an issue raised for the first time in federal court, we deny relief. We would never permit a habeas corpus applicant to urge a claim not exhausted in state court. *Picard v. Connor,* 1971, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438; *Galtieri v. Wainwright,* 5 Cir. 1978, 582 F.2d 348; 28 U.S.C. § 2254(b), (c) (1970). It is not merely the inconsistency of our action that causes me to differ; it is also that the policy on which my brethren purport to rely was not fashioned for this end, and our action does not serve the amity for which the policy was designed. In that respect it is, of course, immaterial for what offense Lerma was incarcerated.

The judge-made doctrine of exhaustion, now codified in 28 U.S.C. §§ 2254(b) and 2254(c),[1] requires a state prisoner to exhaust "the remedies available in the courts of the State" as a prerequisite to federal habeas corpus relief. The rule reflects a federal policy attempting to effect a proper balance between the roles of state and federal judicial institutions in protecting federal rights.[2] "These fundamental interests underlying the exhaustion doctrine are sat-

---

1. 28 U.S.C. §§ 2254(b) and 2254(c) provide:

   (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

   (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of

this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

2. The exhaustion requirement is merely an accommodation of our federal system designed to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights. *Fay v. Noia,* 372 U.S. 391, 438, 83 S.Ct. 822, 848, 9 L.Ed.2d 837 (1963).

*Wilwording v. Swenson,* 1971, 404 U.S. 249, 250, 92 S.Ct. 407, 408–09, 30 L.Ed.2d 418, 420–21.

isfied by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Tooten v. Shevin,* 5 Cir. 1974, 493 F.2d 173, 176, *cert. denied,* 1975, 421 U.S. 966, 95 S.Ct. 1957, 44 L.Ed.2d 454 (footnote omitted). "The exhaustion doctrine should not, therefore, be applied mechanically without regard to factual setting." *Pate v. Holman,* 5 Cir. 1965, 343 F.2d 546, 547.

*Preiser v. Rodriguez,* 1973, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439, on which my brethren rely is not apposite here for it involved invocation of section 1983 relief by a prisoner whose proper remedy was held to be habeas corpus. The prisoner sought to avoid seeking relief by that route because he would have been required to expand state remedies. The court held that, before resorting *directly* to a federal court, he must exhaust state administrative remedies.

Lerma has pursued his state remedies fully through Texas courts. The Director made his position, adverse to Lerma's, known in Lerma's state habeas proceeding without there suggesting that Lerma should have pursued an administrative appeal. To require him even then to appeal to the Director would likely have been a futile act; the TDC rules were adopted under its present Director and, in Lerma's case, were applied as they were written and intended. *Cf. Houghton v. Shafer,* 1968, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319. To require him now, after submitting his claims to state court and exhausting his state *judicial* remedy two years ago, to return to the state administrative body and try again for administrative relief would surely entrap him in a maze. By ruling now on Lerma's petition, the federal court does not deprive the state of its primary role in enforcing federal rights.

Moreover, this case poses no potential disruption to state adjudicatory processes. There is no state proceeding now pending that may be disturbed. As discussed below, the state, in any event, will not be required to adopt new procedures. Dismissing this suit now to require Lerma to file an administrative appeal would serve no discernible comity interest and would not encourage others in the future to by-pass administrative relief, for they would in any event be required to exhaust state judicial remedies and their failure to seek administrative anodyne would there be a defense.[3]

In contrast to the limited burden on the state, the deprivation suffered by Lerma is substantial.[4] Lerma was sentenced to 15

**3.** This suit is not barred by laches. Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts permits the dismissal of a delayed petition where the state has been prejudiced in its ability to respond to the petition. No such prejudice exists here; the facts relevant to whether Lerma was afforded adequate protections under the Due Process clause have proved readily discoverable and largely undisputed. Congress, in 1976, amended Rule 9(a), Act of Sept. 28, 1976, Pub.L. 94–426, § 2(7), 90 Stat. 1335, to eliminate the Supreme Court's original provision under which a rebuttable presumption of prejudice arose after five years of delay. *See* H.Rep.No. 94–1471, 94th Cong., 2d Sess. 5, *in* 1976 U.S. Code Cong. & Admin.News 2478, 2481. The legislative history of Rule 9(a) indicates the appropriateness of extreme caution before a federal court dismisses a state inmate's habeas petition on grounds of delay. No evidence has been introduced to indicate that Lerma's delay in filing his state suit was purposeful on his part, nor has any clear indication of prejudice to the state been shown. The state may have difficulty in reconstructing what happened in the soybean patch in 1974, but Lerma is still available and there is no indication in the record that Shine, the only witness who testified against him, is not also available. Rule 9(a) is directed at prejudice in responding to the petition for the writ, not at the problem of the remedy if the writ is granted.

**4.** The respondent has argued that, because Lerma's classification has been subject to continual review since October 8, 1974, and because he was in fact subject to subsequent disciplinary proceedings, it would be difficult if not impossible to calculate the relief to which Lerma would be entitled should a disciplinary committee now find in his favor on the October, 1974 charge. I disagree.

First, I note that, although two good time statutes, which granted good time at different rates, were "on the books" in Texas during 1974, it is now clear that Lerma was accruing 20 days a month in good time credit under art. 6184*l,* Tex.Civ.Stat.Ann. (Vernon 1970) (repealed 1977), and was not affected by art. 6166v, Tex.Civ.Stat.Ann. (Vernon 1970). The Texas Court of Criminal Appeals held in 1976 that art. 6184*l,* adopted in 1943 and amended in

days in solitary confinement, forfeiture of 360 days of good time, and demotion from Class I to Class III status,[5] which prevented him, until reclassified, from accruing further good time. Although the TDC, in brief, argues that Lerma might again receive his accrued good time credit based on his future good behavior, that prospect is purely speculative. It is further questionable whether the Director could now restore good time as a commutation of sentence, pursuant to the provisions of the statute under which Lerma accrued good time in 1974, Tex.Civ.Stat.Ann. art. 6184*l* (Vernon 1970) (repealed 1977); Texas, in 1977, enacted a new "good conduct time" statute, Tex.Civ.Stat.Ann. art. 6181–1 (Vernon Supp.1978), providing that good conduct time will apply only to eligibility for parole and non-parole rehabilitation programs that occur outside the prison. Acts of 1977, ch. 347, § 3, p. 932.

Considering both the consequences of Lerma's delay and the loss to him at stake in this suit, I believe the principles of equity militate for, not against, our consideration of Lerma's position.

My brethren do not reach the issue of the constitutionality of the TDC actions. Because of the view I take of the case, I would reach that issue. In any event, should Lerma now seek administrative relief, a resume of the constitutional principles may be in order.

In *Wolff v. McDonnell, supra,* inmates of one Nebraska prison brought suit under 42 U.S.C. § 1983 to challenge the constitutional sufficiency of prison disciplinary procedures that might lead to the revocation of good time credits under Nebraska's good time scheme. The Supreme Court held the Due Process clause applicable to the revocation of good time credit in Nebraska, 418 U.S. at 555–58, 94 S.Ct. at 2974–76, 41 L.Ed.2d at 950–52, and outlined those procedures mandated by the Due Process clause in that context, 418 U.S. at 563–72, 94 S.Ct. at 2978–82, 41 L.Ed.2d at 955–61.

The Court said in *Wolff* that its "analysis as to liberty parallels the accepted due process analysis as to property." 418 U.S. at 557, 94 S.Ct. at 2975, 41 L.Ed.2d at 952.[6] The critical issue in both is not whether a person may validly be deprived of property, or liberty, either for one reason or many; instead, it is whether the state itself has rules that a deprivation may be effected *only* for cause. If the state has such rules, either by statute or regulation, that both recognize a right and protect it against infringement without cause, this creates a protectable interest in liberty or property that cannot be infringed except under constitutionally adequate procedures. The key factor in determining the existence of a protectable interest in good time is not the behavior for which good time may be revoked, but whether the state has statutory provisions creating both a right to good

---

1945 and 1949, had repealed art. 6166v. *Ex parte Weaver,* Tex.Cr.App.1976, 537 S.W.2d 252. At the time of Lerma's October, 1974 hearing, he had been incarcerated for more than 18 months, and had never before been demoted from Class I status; hence, he was deprived of 360 days of actual accrued good time by the action of the disciplinary committee.

Second, when Lerma was the respondent in a disciplinary hearing on January 21, 1975, his sentence required him to remain at Class III status. Lerma has in no way challenged the appropriateness of the committee's disposition at this hearing or its constitutional sufficiency. It may be fairly inferred that had Lerma not been demoted to Class III status in October, 1974, he would have been so demoted on January 21, 1975. *See* Tex.Civ.Stat.Ann. art. 6181–1 (Vernon Supp.1978).

Thus, should the TDC now find in Lerma's favor, the effect of restoring his revoked good time and retroactively restoring his Class I status will be to credit him with 360 days of good time plus such additional good time as would have accrued between October 8, 1974 and January 21, 1975.

**5.** The TDC's classification scheme is set forth in footnote 8, *infra.*

**6.** To paraphrase the analysis as typically cast in the "property" due process cases, there are "such rules or mutually explicit understandings that support [the prisoner's] claim of entitlement [to good time] and that he may invoke at a hearing." *Perry v. Sindermann,* 1972, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580; *Bishop v. Wood,* 1976, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684; *Board of Regents v. Roth,* 1972, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548.

time and forbidding the deprivation of good time except as a sanction for *cause*; under these circumstances, the Due Process clause applies to protect the individual "against arbitrary action of government."[7] 418 U.S. at 558, 94 S.Ct. at 2976, 41 L.Ed.2d at 952.

At the time Lerma was reclassified, Texas had both enacted a statutory right to accrue good time and prohibited its revocation save for cause. Under the 1974 "good conduct time" statute, good time could be revoked only "[f]or each sustained charge of misconduct in violation of any rule known to the prisoner." Tex.Civ.Stat.Ann. art. 6184*l* (Vernon 1970) (repealed 1977). Reclassification was permitted under the statute "from time to time as in [the opinion of the Classification Committee] the circumstances may require." *Id.* Although that statute appears to have afforded the TDC leeway to change inmate classification without cause, the TDC had limited any such discretion by its own initiative under its published rules and regulations, TDC Rules and Regulations and Grievance Procedures, § 2.5.2 (Nov. 1, 1975), *formerly*

TDC Rules and Regulations, § 2.52 (July 9, 1973), the full text of which is set forth in the footnote.[8] Under these provisions, an inmate, such as Lerma, could be demoted to Class III only for a violation of a TDC Rule. Both interests of which Lerma was deprived could thus be revoked only for cause, and, therefore, both are protected by the requirements of procedural due process.

Having concluded that the Due Process clause does govern the procedures under which Lerma, in 1974, could be deprived of good time,[9] the next question to be faced is whether he was in fact afforded due process. Lerma insists he was not because he did not receive the 24 hours written notice mandated by *Wolff, supra,* 418 U.S. at 564, 94 S.Ct. at 2979, 41 L.Ed.2d at 956, and he was not allowed to call witnesses in his defense even though the disciplinary committee made no finding that his doing so would be "unduly hazardous to institutional safety or correctional goals," *Wolff, supra,* 418 U.S. at 566, 94 S.Ct. at 2979, 41 L.Ed.2d at 956. Having identified the key similari-

7. The TDC urges that, because Texas in 1974 permitted the forfeiture of good time "[f]or each sustained charge of misconduct in violation of any rule known to the prisoner . .," Tex.Civ.Stat.Ann. art. 6184*l* (Vernon 1970) (repealed 1977), in comparison to Nebraska, which permitted revocation only for "flagrant or serious misconduct," *Wolff, supra,* 418 U.S. at 545 n. 5, 94 S.Ct. at 2969, 41 L.Ed.2d at 944–45, Texas prisoners have a "less substantial" interest in good time than Nebraska prisoners, and *Wolff*'s mandate does not apply to Texas's good time scheme. This misconstrues the analysis in *Wolff* and in related due process cases.

8. 2.5.2 *Good Time Categories*
   Under the Texas commutation law there are three classes of commutation time or "good time." These good time or time-earning categories are referred to as Class I, Class II, and Class III.
   2.5.2.1 *Class I* provides that each inmate in this time-earning class will receive a total of 20 extra days time for each month served on his sentence, as long as that inmate maintains a clear conduct and work record. Whenever any inmate is received in the Texas Department of Corrections, he is immediately placed in Class I.
   2.5.2.2 *Class II* provides that any inmate in this class or category will receive a total of 10 extra days time for each month served.

This class is set aside for those inmates who have been found in violation of one or more of the rules and regulations of the Texas Department of Corrections. The State Disciplinary Committee is the governing authority for placing an inmate in this classification.
   2.5.2.3 *Class III* provides that each inmate in this category will receive no extra days for each month served. Class III is for those inmates who violate one or more of the rules and regulations of the Texas Department of Corrections. The State Disciplinary Committee is the governing authority which places an inmate in this category and is also the authority for restoring the inmate to a time-earning class. The Committee will act only with the recommendation of the unit warden.

9. Notwithstanding the TDC's adoption in 1975 of procedures that guarantee due process in the revocation of good time, Texas adopted in 1977 a statute that provides, "Good conduct time is a privilege and not a right." Tex.Civ.Stat.Ann. art. 6181–1 (Vernon Supp.1978). We do not reach the applicability of *Wolff* to the revocation of good time accrued under this statute, but we note that good time is still revocable only if "an inmate commits an offense or violates a rule of the department."

ty between the good time statutes of Texas and Nebraska that explains why due process applies to the Texas scheme, I must now consider whether the interests created are sufficiently similar so that the failure to provide Lerma those protections deemed necessary in the context of Nebraska's scheme also constituted a denial of due process in Texas.

In discussing the protection due with respect to the termination of Social Security benefits, the Supreme Court set forth a rubric generally applicable to the determination of what constitutes minimal due process in a particular context; a court should focus on:

the private interest that will be affected by the official action; . . . the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 1976, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (citations omitted). Considering these factors as applied to Lerma, it is evident that the failure to accord him those protections held by the Supreme Court to be required in Nebraska did deny him due process of law. His affected interest was of the same kind as that affected by official action in Nebraska. The risk of an erroneous deprivation was, if anything, greater because the grounds for revocation of good time in Texas are less specific than those in Nebraska. The value of the additional safeguards would, of course, be as great in Texas as in Nebraska. Finally, because Texas has already adopted procedures that more than comply with the dictates of *Wolff*, TDC Rules and Regulations and Grievance Procedures, § 4.0 *et seq.* (Nov. 1, 1975), the granting of a new hearing now to Lerma will impose only a minimal fiscal and administrative burden. Under the *Mathews* calculus, Lerma was entitled to greater protection than he enjoyed; his deprivation cannot be viewed as harmless under the circumstances.

Because of Texas's 1975 procedural reforms, it would be unnecessary for a court now to determine what procedures would suffice as the constitutional minimum in Texas; Texas's new and thoughtful rules supply at least the minimum protection required. They comply fully with the spirit as well as the letter of *Wolff*. Under these circumstances, the TDC Director can fully comply with his constitutional duty simply by affording Lerma a new hearing under the now-existing rules.

Lerma is entitled to a new hearing. *Au fond*, the real difference between my brethren and me is that they say, "Go back and ask the Director of Corrections for a hearing. If he refuses, go again to the state court. Then and only then will you be in proper supplicatory posture for federal consideration." I would say to the warden without further delay, "Do what the constitution requires and accord Lerma due process of law." If Lerma must meet the minotaur, let him at least do so by a path that we do not make labyrinthine.