[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 3880
The petitioner brought a writ of habeas corpus before this court to challenge the length of his physical imprisonment. He claims entitlement to the restoration of eighty (80) days of good conduct credits and hence a speedier release date. He brings this claim against the respondent on behalf of all inmates automatically denied prospective statutory good conduct credit on the basis of their designation as Security Risk Group members (hereinafter "SRG") or Security Risk Group Safety Threat Members (hereinafter "SRGSTM"). The petitioner cites two causes of action: (1) respondent violated the plain reading of Connecticut General Statutes, Sec. 18-7a that confers good conduct credit on sentenced individuals for each month served; and (2) respondent denied petitioner a constitutional right to a liberty interest guaranteed by the due process clause of the federal constitution and Connecticut's "counterpart provisions."
FACTS
The petitioner is a sentenced State of Connecticut prisoner presently.
The petitioner is a sentenced State of Connecticut prisoner presently incarcerated in a segregated unit at the Cheshire Correctional Institution in the custody of the respondent, Larry R. Meachum, Commissioner of Correction. The petitioner was sentenced on May 3, 1993 to serve three years; he was convicted of third degree larceny (2-1/2 years) and also for charges of illegal operation of a motor vehicle and use of a motor vehicle without the owners' permission (two six (6) month terms, one concurrent and one consecutive).
The petitioner's official maximum release date is March 24, 1995. That date takes into account the petitioner's statutory rights to an automatic presentence reduction time (General Statutes, Sec. 18-98d(a) (1992)), discretionary presentence confinement credit (General Statutes, Sec. 18-98d(b) (1992)), and good conduct credit while incarcerated (Connecticut General Statutes, Sec. 18-17a (1992)). If an inmate follows the rules of the prison system, he may benefit from the incentives found in the latter two statutes.
For a presentence detainee who cannot afford to post bond, CT Page 3881 Sec. 18-98d(a) allows a reduction of his sentence equal to the number of days in confinement to the time he began serving the term of imprisonment imposed. The respondent reduced the petitioner's sentenced time by nine (9) months because while awaiting trial and sentencing, the petitioner was confined in lieu of bond to the Montville Correctional Institution on July 31, 1992.
Section 18-98d(b) states that if a presentenced detainee obeys the rules of the facility, he may receive a good conduct reduction of a sentence not suspended at the rate of ten (10) days for each thirty (30) days of presentence confinement. During his presentence confinement period of nine (9) months, the petitioner had the potential to earn ninety (90) days for good conduct reduction, according to the respondent's records specialist during the habeas trial. The petitioner forfeited all ninety (90) days, however, the records specialist said when he incurred four disciplinary charges on March 1 and 3 and April 8 and 11. The petitioner learned of this loss of time only during this habeas trial when the records specialist testified that she noticed the administrative error while preparing for trial while at the same time conducting a forty-five (45) day review of records prior to release. (Charges actually totalled one hundred sixty (160) days, but the specialist said the department could only take away ninety (90) days based on the Supreme Court's findings in Nichols v. Warren, 209 Conn. 191 (1988).)
Once a prisoner receives his sentence, section 18-7a provides an incentive to reduce it. Depending on the date of incarceration, an inmate may earn a number of days off and be credited with good conduct time for good behavior. Section18-7a(c) applies to inmates who are serving up to five years and committed on or after July 1, 1983; it therefore applies to the petitioner who has earned forty-nine (49) days of good time credit.
The petitioner contends that his release date is sooner than March, 1995, because the respondent wrongfully forfeited eighty (80) days of prospective good time. The petitioner bases his argument on the respondent's revision on December 10, 1993 of the correctional institution's Administrative Directive 6.14 that concerns security risk groups while the petitioner was serving time. The directive is punitive in three ways: (1) it automatically classifies an inmate a security risk group safety threat member if (a) he has been found guilty of one of five CT Page 3882 disciplinary offenses, including possession of Contraband A, possessing a dangerous weapon, and (b) had, subsequent to the incident, been designated a security risk group; (2) it automatically denies SRGSTM members the ability to earn statutory good time; and (3) it restricts a classified inmate to close custody units where, among other things, their "living breathing flesh shall be observed every 30 minutes." (Administrative Directive 6.14(D).)
The petitioner does not deny that the respondent has the statutory right to control the operations of the department. He argues, however, that he should benefit from any revision in policy. General Statutes, Sec. 18-81 provides in part that the Commissioner of Correction "shall be responsible for the overall supervision and direction of all institutions. . . . in accordance with recognized correctional standards." Based on his right to direct policy, the respondent revised the directive on October 4, 1994, the fourth time since its inception in January 10, 1992. This change eliminates automatic designation of security risk group threat members by the respondent who must now follow the same due process guidelines in conducting a review of SRGSTM status as set forth in section 9 of the previous directive. That section provides that when the unit director or higher authority has "reasonably determined" that an inmate's behavior or status as a recognized leader of a security risk group is a "threat to the safety of staff, the facility, other inmates, the community or the order of the Department," that inmate shall be notified of a hearing in writing at least forty-eight (48) hours before the hearing date, given reasons for possible designation, and given the opportunity to present witnesses at the hearing. No inmate witness shall be compelled, however, to testify given the security risk to himself within the prison setting, according to Director of Security, Brian Murphy, who testified at trial. Once the Unit Administrator and the Director of Security makes a determination, they must formally notify the inmate in writing.
Based on the automatic loss of future good time credits indefinitely, the petitioner challenges his automatic designation as a SRGSTM member for two reasons: (1) the Department of Corrections determined his designation without following its own formal procedures of first giving timely notice of the prerequisite classification as a SRG member under the old directive; the penalties for SRG affiliation include loss of good time credit already earned, not future credit; and (2) the CT Page 3883 department did not give him the process due him pursuant to the new directive, and hence he prematurely lost credits he could have earned.
As to the first challenge, the petitioner testified that the respondent did not provide proper notification of his SRG member designation until well after his SRGSTM designation. To be designated a SRG member, the Unit Administrator and the Director of Security must have a "reasonable belief" that an inmate is affiliated with a gang, must provide notification and allow an inmate to present any objections, and then be notified in writing of that designation. (Administrative Directive 6.14(6).) The petitioner contends that he did not officially receive written notification of his SRG designation until June 21, 1994, well after his SRGSTM classification. The petitioner said he first learned of his designation as a SRG member upon arrival at the Walker Correctional Institution, where he was transferred on May 7, 1993. The admitting administrator informed the petitioner that the computer indicated his designation. If he questioned it, the administrator advised the petitioner to submit a letter to the Commissioner renouncing his membership. The petitioner did so on May 10, 1993, but did not get a response. Prior to his transfer date, the petitioner received three charges for SRG member activities. Two of the three charges linked the petitioner with gang affiliation on April 11 and 15, and were upheld. The April 15 charge was for possession of a two page Code of Forbiddance which defined rules of obedience to the Latin King organization. On January 3, 1994, the petitioner plead guilty to a Contraband A charge of possessing two weapons, an 8-1/2 inch metal rod sharpened to a point and an 11-1/2 inch metal rod unsharpened, but waived his appearance at the disciplinary hearing. Under the old December 10, 1993 directive, a possession charge like the one against the petitioner was enough to automatically designate an inmate with SRG status, a security risk group safety threat member. The respondent did not automatically designate the petitioner a safety threat member, however, until February 15, 1994, following the correctional facility's SRG hearing on February 1, 1994. The petitioner received the requisite two day notice, and presented objections to the charges linking him a member with the Latin Kings organization. The Latin Kings were one of the several security risk groups that the Corrections Department had defined as "possessing common characteristics which serve to distinguish them from other inmates or groups of inmates and which as a discrete entity poses a threat to the safety of staff, the facility, other inmates or the community." CT Page 3884 (See Administrative Directive 6.14(3)(C).) The Director of Security testified during the habeas trial that the Department of Corrections had reasonable belief that the petitioner was a member based on information from a prison informant. The petitioner protested his designation in a letter to the Commission on February 23, 1994. The Director of Security wrote back on March 18, 1994, stating that the designation would remain and that the petitioner would be ineligible for good time credits until the six month review. (See Administrative Directive 6.14(14).)
The petitioner's second challenge concerns his entitlement to receive due process of the law rather than automatic designation. Following the filing of this lawsuit, May 5, 1994, and three months after the automatic designation, the respondent did just that. It gave the petitioner the requisite two days notice, and conducted a SRGSTM redesignation hearing on May 20, 1994, following section 9 guidelines as if the new directive had been in place. The petitioner contends that the respondent did not permit him to present documents dismissing the two SRG affiliation charges on February 3 and November 18, or his renunciation letter of May 10, and that administrators told him that this evidence would not affect the outcome of the hearing. During the petitioner's redirect, the petitioner said he never told anyone he was a leader, officer, or an enforcer. He said the respondent asked him whether he was a member, and the petitioner said he answered, "Do I have to answer that?" He said that the administrator questioning him said, "I'll take that as a yes." In contrast, the respondent claims that the petitioner made no complaint of inadequate notice and did not seek a continuance to get adequate evidence. On May 25, 1994, the Director of Security (Murphy) filed a determination report recommending redesignation without formal SRG designation. During the petitioner's cross-examination, Murphy said that the department makes an exception to the criteria set forth in section 6 for SRG affiliation if the inmate makes an admission. Murphy admitted that this exception could mean that the department has no other evidence, which is not the case here, since the respondent had an informant. The petitioner received notification on June 21, 1994. The petitioner argues that the respondent still violated his own rules because Administrative Directive 6.14, Sec. 20 provides that any exception to the procedures in the directive shall require written notice from the Commissioner. On September 27, the petitioner received notification that the respondent had conducted the six month review of his February 15 designation as CT Page 3885 a gang threat member and would uphold the classification and continue to deny him good time credits.
SUBJECT MATTER JURISDICTION
The merits of this writ cannot be reached before resolving the respondent's challenge in his brief that this court lacks jurisdiction over the subject matter, and must therefore deny the petitioner's complaint. Once the question of jurisdiction is raised, the court cannot proceed further without fully resolving the claim. Vincenzo v. Warden, 26 Conn. App. 132, 135 (1991).
The state's constitution and statutes outline the scope of the court's habeas corpus jurisdiction. Article 1, Sec. 12 of the constitution provides that the judiciary has the right to look into the legality of a prisoner's incarceration. Legislators have recognized this statutory right since 1808. Wesley Horton, TheState Constitution: A Reference Guide, 72. Moreover, sections52-466 and 52-470 of the General Statutes (1994) define habeas corpus relief. The former statute states at subsection (a) that the judicial district in which the person whose custody is in question has venue when the person is claiming illegal confinement or deprivation of his liberty. Section 52-470
provides that a court hearing a habeas petition shall "inquire fully into the cause of imprisonment. . . ."
The history of our common law is consistent with these statutory principles of allowing petitioners to raise habeas claims based on illegal custody and physical restraint of liberty as opposed to other legal rights or interest such as conditions of prison confinement. Unless a claimed violation implicates a liberty interest, the habeas court cannot decide the matter.Vincenzo v. Warden, supra, 26 Conn. App. 133. The Appellate Court in Vincenzo found that the habeas court properly dismissed for lack of jurisdiction an inmate's habeas petition because he did not have a protected liberty interest in parole release based on the language of the statute. Id., 141.
The lower court in Allen v. Commissioner, 8 Conn. L. Rptr. No. 15, 478 (1993) interpreted the decision in Vincenzo to support the proposition that petitioners can only raise issues pertaining to the fact or duration of confinement in a habeas action. The court cited Preiser v. Rodriguez, 411 U.S. 475 (1973) whereby the Supreme Court decided that habeas relief, both under common law and the federal habeas statute, is available to attack CT Page 3886 the fact or duration of physical custody, but not to raise other complaints, such as the conditions of prison life. Id., 499. The court does not limit habeas relief to just immediate release from illegal custody, it is also available to attack future confinement and obtain future releases. Id., 487. The second circuit in Abdul-Hakeem v. Koehler, 910 F.2d 66, 68 (1990) also characterized Preiser as the case in which the Supreme Court enunciated the touchstone for determining whether habeas corpus,28 U.S.C. § 2254 or 42 U.S.C. § 1983, is the proper vehicle for a prisoner's suit.
In Preiser, three state prisoners argued that their deprivation by the deputy warden of already earned good time credits without due process of the law was causing or would cause them illegal confinement. Once their conditional release date had passed, any future detention was unlawful. Preiser v. Rodriguez, supra, 411 U.S. 478. The Supreme Court determined that a writ of habeas corpus was defendants' sole federal remedy because they challenged the fact or duration of their physical imprisonment, and under the circumstance of the case were entitled to immediate release. Id., 487.
The petitioner in this case also challenges the fact or duration of his confinement. Unlike the defendant in Preiser, our petitioner does not challenge the forfeiture of already earned good time credits or immediate release. Rather, he claims that the forfeiture of future good time credits not yet earned deprives him of an earlier future release date from prison which is also in the realm of the Preiser holding. This court concludes, therefore, that it has jurisdiction to reach the merits of the petitioner's claim.
STATUTORY GOOD CONDUCT CREDIT IS NOT AUTOMATIC
The petitioner claims that he and other inmates have a statutory right to automatically receive good conduct credits at the rate of ten (10) days at the end of each month served, and that the respondent has violated that right by enforcing Administrative Directive 6.14, which automatically denies an inmate classified as a security risk group member the ability to earn good time credits any time in the future. The petitioner cites Nichols v. Warren, supra, 209 Conn. 191 as controlling authority that a prisoner cannot lose statutory good time that he has not yet earned. He also cites Murray v. Lopes, 205 Conn. 27
(1987) as controlling authority that sentence reduction credit CT Page 3887 automatically accrues to all prisoners. The petitioner misinterprets the plain meaning of section 18-7a and its legislative history. He also misunderstands the intent of Nichols
as applied to the statute and misquotes Murray.
Since the court committed the petitioner to a correctional institution after July 1, 1983, to serve a sentence up to five years, good conduct credit becomes available pursuant to paragraph (c) of section 18-7a which reads:
 Any person sentenced to a term of imprisonment for an offense committed on or after July 1, 1983, may, while held in default of bond or while serving such sentence, by conduct and obedience to the rules which have been established for the service of his sentence, earn a reduction of his sentence as such sentence is served in the amount of ten days for each month served and pro rata for a part of a month served of a sentence up to five years. . . . Misconduct or refusal to obey the rules which have been established for the service of his sentence shall subject the prisoner to the loss of all or any portion of such reduction by the commissioner or his designee.
The reading of the statute on its face is clear. The first section provides a reduction of sentence if a person displays good conduct and obeys the rules of the institution. The language is discretionary since an individual "may" earn good time credit. The second section provides for forfeiture of any previously earned reduction. Should the inmate exhibit bad conduct and refuse to obey the rules the commissioner or his agent "shall" take away all or any portion of the credits previously earned that had reduced his sentenced time. The language in the second sentence is mandatory, the commissioner "shall" take earned credits away. The Connecticut Supreme Court, applying the statute in Nichols v. Warren, supra, 209 Conn., wrote that the statute was clear and unambiguous, and there was therefore no room for construction. Id., 196. "[T]he commissioner of correction cannot diminish an inmate's good time sentence reduction for improper behavior until the inmate earns the reduction as the sentence is served. Prospective forfeiture or unearned good time credit is not permitted under the present statute." Id., 197-98.
In Nichols an inmate earned twenty-one (21) days of good time credit in the course of two months, but the commissioner prospectively forfeited one hundred twenty (120) days of future good time as a result of the inmate's two infractions (disobeying a direct order and possessing a home made weapon). The inmate CT Page 3888 thus owed the excess of ninety-nine (99) days on his term. Id., 194. The Connecticut Supreme Court ordered the commissioner to recalculate the petitioner's good time credit he forfeited before the inmate earned it. Id., 195. Since the statute allows forfeiture of only twenty-one (21) days, the days already earned, the commissioner cannot lengthen sentences by forcing an inmate to "owe" time for disciplinary infractions that exceed the number of credits already earned. Id., 194. Prospective good time credit is not reachable until prisoners earn them on a month-to-month basis. Id., 201.
The Nichols court holding was consistent with the intentions of the legislators who enacted the good time statute in 1888, and amended it twice, in 1901 and 1983. Its original concept of rewarding inmates with incentives for good time remains untouched. The original statute allowed a prisoner to deduct five days from his term if he "rendered prompt and cheerful obedience to the rules of the prison"; if he displayed "any serious act of insubordination or persistent refusal to conform to prison regulations at any time during his confinement," the warden and board of directors could deduct all or any portion of "the time previously gained by good conduct. . . ." Id., 198-199. The 1983 revision eliminated the practice by correction officials since 1911 of calculating good time credits at the beginning of a term of incarceration. Id., 199. Some legislators believed the practice was too punitive because deducting the entire amount at the "front end" of the sentence, "you revert to . . . the system of punishment for poor behavior. So that instead of granting good time you actually end up earning penalties for poor behavior." Id., 200.
In Murray v. Lopes, supra, 205 Conn., the Supreme Court decided that the habeas corpus petitioner who was in the custody of the Department of Mental Health while serving time could still earn statutory sentence reduction credit and gain an earlier release from the psychiatric ward. Id., 22. "[S]tatutory sentence reduction credit . . . automatically accrues to all prisoners,subject only to disciplinary forfeiture." (Emphasis added.) Id., 35.
Prospective good time credits are clearly not an entitlement. The petitioner is correct in arguing that all inmates are eligible to earn good conduct credits. According to the statute, anyone "may" earn these credits to reduce sentences. Yet, the petitioner incorrectly argues that he and every other inmate CT Page 3889 automatically receive future good time credits. By implication, he argues that he can break any rule of prison life, i.e., instigate fights and make weapons, and not pay any consequences, including denial of prospective good time credit. If that were the case, section 18-7a would have no meaning in rewarding good behavior.
The petitioner clearly ignores the statute's history and the legislators' intent, and misconstrues the court's holding inNichols. Nowhere in Nichols does the court reward an inmate all the good time credits he might have received had he abided by the rules of the prison system. And nowhere in Nichols does the court say that the commissioner must provide jail reduction credit if an inmate displays bad behavior. Rather, the court merely ordered a "recalculation" of the petitioner's good time credit because the inmate's punishment for infractions had exceeded the good time credit he had actually earned or could earn during his sentenced period. The commissioner cannot lengthen an inmate's court ordered sentence. It is inappropriate for him to use an inmate's future good conduct credit towards punishment for infractions in the present. Conversely, there is no obligation by the commissioner to reduce a prisoner's sentence unless the inmate earns the statutory privilege by exhibiting good behavior. In regard to Murray, the case is consistent with this court's reading of the statute allowing a prisoner to earn good time credit unless he has forfeited his chance to reduce his sentence by pursuing activities not in keeping with the institution's rules. The petitioner conveniently leaves out the second part of the sentence underlined, supra, which denies inmates the automatic right to accrue credits. The petitioner in this case, therefore, may not get automatic good time credits unless he has earned the reduction by obeying the rules of the correctional institution.
GOOD TIME CREDITS ARE LIBERTY INTERESTS AND CANNOT BE DENIED WITHOUT DUE PROCESS OF THE LAW
This court cannot decide this case on statutory grounds alone because the petitioner raises constitutional issues as well. Despite his misreading of Nichols the petitioner has a justifiable expectation of earning good time credits based on the plain reading of the statute. Yet, because the respondent automatically classified the petitioner as a security risk group safety threat member, the petitioner was denied potential earning capacity and hence a liberty interest protected by the due CT Page 3890 process clause of the fourteenth amendment. Revocation of such credits by the respondent must be supported by some evidence in order to satisfy the minimum requirements of procedural due process. Superintendent v. Hill, 472 U.S. 445, 447 (1985).
A liberty interest may be created by constitutional or statutory provisions. Hewitt v. Helms, 459 U.S. 460, 469 (1983). There is no guarantee of good time credit in the constitution, but a person's liberty is equally protected even when the liberty itself is a statutory creation of the state. Wolff v. McDonnell,418 U.S. 539, 558 (1974). When the state creates a protected liberty interest, it uses in its statutory framework "explicitly mandatory language in connection with requesting specific substantive predicates." Hewitt v. Helms, supra, 459 U.S. 472. The prisoner's right and expectation to good time credits have "real substance" when "its deprivation is a sanction authorized for major misconduct." Wolff v. McDonnell, supra, 418 U.S. 557.
Section 18-7a satisfies the prerequisites for a liberty interest. It contains unmistakably mandatory language in which the commissioner "shall" forfeit under certain conditions an inmate's previously earned good time credits toward an earlier release date. The statute also contains language eschewing bad behavior so that a prisoner has a justifiable expectation that he "may" earn good time to reduce his sentence. Although the statute's substantive predicates that govern official decision-making are not precise, the language of the statute implies the need for control in a prison setting by demanding from a prisoner "good conduct and obedience to the rules." For the foregoing reasons, the petitioner has a liberty interest by virtue of the language of the statute. If the petitioner does not follow the rules, he may not earn good time credits. If he has already earned them, the respondent can take them away if the petitioner has ignored the prison rules.
A LIBERTY INTEREST IN THE PRISON SETTING IS NOT UNFETTERED
Once the court determines that a liberty or property interest exists, it must then determine whether it has deprived a prisoner of that interest, and whether the procedures for that denial have been constitutionally sufficient. Kentucky Department ofCorrections v. Thompson, 490 U.S. 454, 459-60 (1989). In a prison setting, a prisoner's rights "may be diminished by the needs and exigencies of the institutional environment," but he may not be "wholly stripped of constitutional protections when he is CT Page 3891 imprisoned for crime." Wolff v. McDonnell, supra, 418 U.S. 555. In that setting, the requirements of due process are "flexible."Superintendent v. Hill, supra, 472 U.S. 454. The court must take into consideration the interests of the parties and balance their interests affected by a particular action. Id., at 454; Wolff v.McDonnell, supra, 418 U.S. 560. Both interests are legitimate — the inmate's whose prospective freedom is threatened by the loss of good time credits, and the prison administration's whose prime concern is in assuring the safety of inmates and prison staff.Superintendent v. Hill, supra, 472 U.S. 455.
The evidentiary standard for due process in a prison setting is "some evidence" that supports the prison disciplinary board's revocation of good time credit. Id., 455. Since "prison disciplinary proceedings take place in a highly charged atmosphere . . . prison administrators must often act swiftly on the basis of evidence that might by insufficient in less exigent circumstances." Id., 456.
In Hill, the Supreme Court affirmed two lower Massachusetts court rulings finding that the respondent inmates were guilty of assaulting another inmate even though prison officials only saw them fleeing the scene and not the actual assault. The prison disciplinary board decision was not "arbitrary" since they had some "support" to revoke good time credits. Id., 457. Even if the evidence appeared "meager" and did not directly identify any of the three inmates as the assailant, the board satisfied the minimum requirements of procedural due process. Id., 457.
The respondent also found some evidence to identify the petitioner as a security risk group member. The respondent had a reasonable belief of the petitioner's affiliation with prison gang members based on information obtained from an inmate informant and the petitioner's own recurring disciplinary charges. The respondent had confiscated from the petitioner propaganda relating to the Latin King organization as well as illegal homemade weapon shanks. When the respondent conducted a SRG hearing on February 1, 1994, he was not without the support acceptable to the Hill court. The petitioner does not claim that the respondent wrongfully revoked already earned good time credits or has the right to forfeit sentence reduction credits for misconduct. He only argues that his designation without official written notice put him at a greater risk for later SRGSTM designation and the accompanying mandate of forfeiture of good time credits. The court finds, therefore, that the CT Page 3892 respondent has satisfied the minimal evidence requirements in finding that the petitioner posed a threat to the prison environment.
DUE PROCESS
Due process in a prison setting requires that the fact-finder provide, in addition to notice, a hearing date, and the opportunity to be heard, a written statement describing the evidence against a prisoner and the reasons for the disciplinary action. Wolff v. McDonnell, supra, 418 U.S. 563. "The provision for a written record helps to assure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts where fundamental human rights may have been abridged, will act fairly." Id., 565. But when a situation is "unduly hazardous to institutional safety or correctional goals," the court will defer to the wisdom of prison authorities. Id., 566.
The petitioner in our case received notice of the February 1 SRG meeting once the respondent suspected upon a "reasonable belief" that the petitioner was a security risk group member. The respondent did not report findings of evidence and reasons for disciplinary action because this hearing was not a disciplinary hearing as proscribed in Wolff. The petitioner's liberty interest was not in question at this time. No forfeiture of prospective good time credits was at stake, only the potential forfeiture of already earned sentence reduction credits. (Although the record is unclear on that issue, the petitioner concedes in his brief that the respondent has the right to take away already earned credits for the petitioner's misconduct.) Rather, by conducting the hearing, the respondent intended to confirm his suspicion of the identity of a potential security risk to the prison setting, certainly within his statutory province of jurisdiction. Administrative procedural guidelines that the Department of Corrections uses to ease the complexity of its organization are not a liberty interest and are, therefore, not protected by the due process clause of the fourteenth amendment.
Automatic designation of SRGSTM status without a modicum of due process deprives a prison of a protected liberty interest. "Where a prisoner has a liberty interest in good time credits, the loss of such credits threatens his prospective freedom from confinement. . . . Thus the inmate has a strong interest in assuring that the loss of good time credits is not imposed CT Page 3893 arbitrarily." Superintendent v. Hill, supra, 472 U.S. 454, citingWolff v. McDonnell, supra, 418 U.S. 561.
The petitioner here is entitled to the Wolff court's procedures before being deprived of a liberty interest, notice, a written statement of the evidence and the reasons for a SRGTM designation, a hearing, and the opportunity to be heard. The December, 1993, directive, which applied to the petitioner while he was serving time, is therefore unconstitutional because automatic designation did not provide him with minimal due process. The respondent must follow its own rules, unless it has approved an exception, which does not appear to be the case here. Other prison staff members, no matter how powerful, cannot change the rules, according to the directive. If SRG affiliation and a written notice of that designation precede a SRGSTM classification, as pursuant to the directive, then the respondent and his staff must follow its own guidelines and not arbitrarily make new rules on a case-by-case basis. All prisoners are afforded equal protection of the law. This court is not saying that the respondent cannot designate an inmate a security risk group safety threat member at any time. Rather, it insists that the facts must point in that direction only if due process is in place. Ironically, the respondent did give the petitioner a proper hearing in May, months after the initial automatic designation. But since the respondent forfeited prospective good time credits on February 15 without the requisite hearing, this court orders the respondent to recalculate the petitioner's good time credits, taking into consideration the credits he might have earned, subject to any deduction for misconduct during those three months.
Mihalakos, J.